[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 8, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-13112

_____

D. C. Docket No. 96-00768-CV-A-N

WILLIAM L. SULLIVAN,

Petitioner-Appellant,

versus

JAMES DELOACH,
TROY KING,
Attorney General of the State of Alabama,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(August 8, 2006)**

Before HULL and WILSON, Circuit Judges, and DUPLANTIER,[*] District Judge.

HULL, Circuit Judge:

William L. Sullivan ("Sullivan"), an Alabama prisoner serving a life sentence for murder, appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition. In his § 2254 petition, Sullivan argued that he received ineffective assistance of trial counsel because his counsel failed to call Sullivan's daughter, Renee Sullivan ("Renee"),[1] to testify at his murder trial. Renee was five years old at the time of the murder and has given conflicting statements. We need not address the performance prong of Sullivan's ineffective-assistance claim because Sullivan has so clearly failed to establish the required prejudice prong of his claim. Thus, after review and oral argument, we affirm.

## I. BACKGROUND

In March 1990, Sullivan was convicted of the April 1989 murder of Michael Smith ("Smith"). At the time of Smith's death, the defendant Sullivan and his wife Janice Sullivan ("Janice") were separated. The victim Smith worked for defendant Sullivan's roofing company and had lived with Sullivan and Janice for a short time. Defendant Sullivan began to suspect that Janice and Smith were

---

[*]Honorable Adrian G. Duplantier, United States District Judge for the Eastern District of Louisiana, sitting by designation.

[1]Renee's name is spelled various ways throughout the record. For simplicity, we refer to her as "Renee" throughout this opinion.

romantically involved. Sullivan then kicked Smith out of their home, and Sullivan repeatedly threatened Smith. On April 21, 1989, the defendant Sullivan discovered Janice and Smith together in a public place and stabbed Smith with a screwdriver. Within the week, Janice obtained a restraining order against Sullivan and commenced divorce proceedings. One witness testified that Sullivan admitted to stabbing Smith with a screwdriver on April 21 and that after doing so, Sullivan stated that next time he would kill Smith.

Just six days later, on April 27, 1989, Janice and Smith were together at the home of Kitty Sullivan, who was Janice's sister-in-law. The defendant Sullivan came to Kitty's home in his truck. This time Sullivan had a knife and repeatedly stabbed Smith with the knife. Sullivan then left in his truck. Smith died at the scene even before the paramedics arrived.

At trial, defendant Sullivan admitted that he came to Kitty's home on April 27, that he had a knife with him when he arrived, that he opened the blade on his knife after he got there, and that he stabbed Smith multiple times with his knife, killing him. Sullivan argued, however, that his stabbing and killing of Smith was in self-defense. Sullivan claimed that Smith jumped on him first. However, Sullivan admits he never saw a knife on Smith. Further, no one, including the paramedics, the police, or neighbors, found a knife on Smith or near Smith's body

3

at the scene.

We describe in detail the trial testimony about the events of April 27, 1989, and then explain why Sullivan has established no prejudice from Renee's not testifying.

### A.     Kitty's Testimony

The murder occurred at the home of Kitty Sullivan, who testified for the state at trial. Kitty Sullivan testified that the defendant Sullivan and his wife Janice were separated and that Janice and Smith had been seeing each other. Kitty testified that on the day Smith was killed, Janice and Smith were in her backyard when the defendant Sullivan arrived at her house. Kitty instructed her daughter Kim, who was 16 years old, to go and tell Janice and Smith that Sullivan was there. The defendant Sullivan first came inside the house. Sullivan asked Kitty where Janice was, and she indicated Janice was outside. Kitty stated that Sullivan walked to the back door and Janice met Sullivan at the back door. Kitty saw Janice and Sullivan talk at the back door but did not recall the conversation. Kitty testified that Renee, Janice and Sullivan's five-year-old daughter, was also standing at the back door as Janice and Sullivan talked.

Kitty went to her den to tell her boyfriend, David Hyatt, there might be trouble. Janice then came in the house and stated that Sullivan and Smith were

4

fighting. Kitty sent her son next door to call the police, and Janice "grabbed the baby [Renee] and run to my daughter's [Kim's] room in the house." Kitty went to the front door and saw Smith walking across the street. Kitty also saw the defendant Sullivan coming out of the backyard with blood on his shirt. Kitty walked with Sullivan to his truck, where he apologized for what happened at her house but stated that Smith was "going to learn not to mess with" Sullivan's wife Janice.

As the defendant Sullivan drove off, Sullivan told Smith that he was not finished with him. In the meantime, Smith had fallen down, and Kitty told him the paramedics were on the way.

**B.     Kim's Testimony**

Kim Sullivan, Kitty's 16-year-old daughter, testified to approximately the same sequence of events as Kitty. Kim went to the backyard to tell Janice that Sullivan was there. Kim stated that Janice then followed her in the back door, where they met the defendant Sullivan. Janice told Sullivan that they were at Kitty and David's house and not to go in the backyard, and Sullivan responded, "I don't care whose house we're at."

Kim went back into the house and did not witness the stabbing. Kim did not see Sullivan or Smith until they had left the backyard. Kim then went outside and

saw that the defendant Sullivan had blood on his shirt and a knife in his right hand. Sullivan's knife had approximately a three-inch blade and had blood on it.

Sullivan told Kim, "You tell Janice I enjoyed her being with me." Kim then crossed the street to where Smith was and observed Sullivan driving away. Before driving away, the defendant Sullivan pointed his finger at Smith and stated that he was not done with him yet.

Kim did not notice any wounds on the defendant Sullivan. Two police officers testified that when Sullivan turned himself in to the police the day after Smith died, Sullivan had minor cuts or abrasions on his face and elbow, bruising on his arm, and a scratch across his stomach. Through W.R. Huett of the Montgomery Police Department, the State admitted photographs taken of Sullivan by Huett when Sullivan turned himself in the day after the incident. The pictures depicted a bruised area on Sullivan's upper arm, a small, thin scratch across Sullivan's stomach, and a scrape on the left side of Sullivan's face. Detective Shawn Smith acknowledged that Sullivan also had an abrasion on his right elbow.

## C.    Smith's Wounds

Although the defendant Sullivan had only minor cuts and left the scene, Smith was mortally wounded by Sullivan and died at the scene. Dr. James Lauridson ("Dr. Lauridson"), the state medical examiner, conducted the post-

6

mortem examination of Smith. Dr. Lauridson testified that Smith had seven serious stab wounds and about ten other, less significant wounds, including cuts, abrasions, and bruises. Through Dr. Lauridson, the state admitted into evidence photographs of Smith's wounds, and Dr. Lauridson testified about the depicted wounds. For example, Dr. Lauridson described "a very large gaping wound over the right side of the chest," which "extends into the chest cavity and causes a wound to the right lung." Dr. Lauridson also described a large, gaping wound right under the right armpit, and a more superficial wound in that same area, which extended into the muscles of the chest wall. He then described another stab wound just under the left armpit, which entered the left lung and left side of the heart and resulted in a significant amount of bleeding into the left chest. Dr. Lauridson also described a number of wounds on Smith's back, including one stab wound, a "large gaping stab wound across the side of his left thigh," and two stab wounds in the right elbow area.[2]

Dr. Lauridson stated that the cause of Smith's death was multiple stab wounds. Dr. Lauridson stated that it was impossible to say exactly how the particular injuries occurred, but that some seemed defensive, meaning that they

[2]The photographs of Smith's wounds are in the record and clearly show seven serious, large, gaping stab wounds, extensive bleeding, plus multiple other cuts, abrasions, and bruises. In contrast, the photographs of Sullivan show no cuts and only one scratch that is so minor as to be hardly visible.

were incurred as a result of Smith's defensive posture. He admitted that the wounds possibly could have been inflicted as two individuals rolled on the ground. However, Dr. Lauridson stated Smith's wounds were unlikely to have been caused accidentally. Dr. Lauridson also testified that, in light of the number of wounds and the directions and pathways of the cuts, it was possible but "highly unlikely" that Smith's wounds were caused by tussling between two people, as opposed to an intentional stabbing.

### D. Smith Had No Knife

Before discussing the defendant Sullivan's version of the events, it is noteworthy that there was no evidence that Smith had a knife on him on the day of his murder. Officers, paramedics, and a next door neighbor testified to securing the crime scene and body, and none of them found a knife or even a knife sheath on Smith. Kitty also testified that she did not see a knife on Smith that day. Further, as detailed below, even Sullivan himself testified three times that he did not see a knife on Smith.

### E. Sullivan's Trial Testimony

Sullivan testified that Smith had worked for and lived with him but had moved from the Sullivan home a few months prior to April 27, 1989. Sullivan became suspicious of Janice and Smith's relationship in February 1989.

8

The defendant Sullivan admitted that he usually carried a small knife and had a knife at Kitty's house on April 27, 1989. Sullivan further admitted that he had fought with other men over Janice in the past. In one such incident in 1975, when Sullivan learned that Janice was having an affair with another man, Sullivan attacked the man with a Coke bottle and cut his throat; however, Sullivan alleged that the man had run over Sullivan with a car earlier in the day, and that was the real motivation for the assault. Sullivan also admitted that he had assaulted the same man upon learning that he was again having an affair with Janice in 1979 or 1980, but alleged that the man had attacked him earlier in the day. Sullivan further acknowledged that he may have made threats against Smith, but testified that he never intended to kill Smith and did not mean any statements that he did intend to kill Smith. As to the incident the week before Smith's death, Sullivan acknowledged stabbing Smith with a screwdriver, but he claimed that Smith threatened and ran at him. Thus, the defendant Sullivan acknowledged attacking and assaulting Janice's various boyfriends prior to April 27, 1989, but claimed his attacks on her boyfriends were because they either threatened or assaulted him earlier.

As to the events of April 27, 1989, Sullivan testified that he and Janice were planning to meet. When Sullivan went to his mother-in-law's house to pick Janice

9

up, his father-in-law told him she was at Kitty's, so he proceeded to Kitty's house. Sullivan denied knowing that Janice had filed for divorce or that she had obtained a restraining order against him.

When he arrived at Kitty's, Sullivan briefly spoke to Kitty, her daughter Kim, and David Hyatt (Kitty's boyfriend), and then proceeded to the side door, where he met Janice. Sullivan admitted talking with Janice at Kitty's house. Thus, there was no need for Sullivan to go to the backyard in order to see Janice.

Further, Kim testified that Janice told Sullivan not to go to the backyard. Sullivan claimed that he did not recall the substance of his conversation with Janice. Sullivan admitted, however, that after he spoke to Janice, he assumed Smith was at Kitty's. Sullivan then went into the backyard as Janice went into the house, walked around the back of the house, but did not see anyone. According to Sullivan, Smith then jumped on him from the side. Sullivan testified that Smith grabbed and hit him, and the two tossed, tumbled, and fought.

The defendant Sullivan even admitted that he did not see a weapon on Smith and that Sullivan drew his own knife on Smith. Specifically, Sullivan testified that Smith "come at [Sullivan] with both hands" and struck him all over. Sullivan then testified: "We tossed and tumbled and fought. During the fight, I drawed my knife." In response to the question of whether he knew or saw at that time whether

10

Smith had a knife in his hand, Sullivan stated "No, sir."  When questioned again, he stated: "I never seen a weapon."  Sullivan testified that they broke away momentarily while still on the ground, and he was able to take from his pocket a small knife, less than two inches long, and open it.  In response to the question whether he saw a weapon in Smith's hand at that time, Sullivan replied: "No, sir.  Everything was happening too fast."

Sullivan's own testimony established that Sullivan had a knife and Smith did not have a weapon.  Sullivan also admitted that at some point they broke away from each other.  Rather than try to run away, Sullivan admitted that he got out his knife when they broke away.  Sullivan claimed that he could not run away at that time because he recently had hernia surgery.  Moreover, according to Sullivan, Smith then came back at him, and neither of the men broke away thereafter.  Thus, Sullivan's version, in effect, is that they broke away, Sullivan got out his knife, and Smith, who had no knife, came back at Sullivan.

According to Sullivan, Smith sustained the stab wounds as they struggled with each other on the ground.  Sullivan claimed that one stab wound to Smith occurred as Sullivan attempted to get Smith off of him.  However, Sullivan admitted that Smith never was in possession of Sullivan's knife.  Sullivan did sustain a scratch across his stomach from his own knife during their struggle.

11

Despite Dr. Lauridson's testimony that Smith had seven deep, gaping stab wounds, Sullivan testified that he did not intend to stab Smith, but was only trying to get Smith off him. When they separated again, Smith ran, and Sullivan got off the ground. Sullivan did not pursue Smith, but told him he would get him another time.

After he left Kitty's, the defendant Sullivan went to his mother's house and then left there and drove around. Sullivan admitted that at some point on the drive, Sullivan threw his knife away. The next day, Sullivan was informed that Smith had died, and he made arrangements to turn himself in to the police.[3]

## F.    Jury Instructions and Verdict

The state trial court instructed the jury on murder (the charge in the indictment), manslaughter caused by sufficient provocation in the heat of passion, reckless manslaughter, and criminally negligent homicide. The trial court also instructed the jury on self-defense. After beginning deliberations, the jury asked the court for additional instructions on sudden heat of passion provocation. The trial court then instructed the jury again on the elements of murder and manslaughter and the effect of a provocation defense. The following morning, the jury returned a verdict finding Sullivan guilty of murder. The trial court sentenced

---

[3]The state also called Janice Sullivan, but she asserted the marital privilege and did not testify about the events of April 27, 1989.

Sullivan to life imprisonment. Sullivan moved for a new trial, arguing, <u>inter alia</u>, that the state failed to comply with its <u>Brady</u> obligations. After hearing evidence, the trial court denied the motion.

### G.  State Direct Appeal

Sullivan appealed his conviction to the Alabama Court of Criminal Appeals, raising issues concerning the admission of photographs and a video tape into evidence, his motions for acquittal and for a new trial, the testimony of an expert witness, and the use of the Habitual Felony Offenders Act. The Alabama Court of Criminal Appeals affirmed his conviction without opinion. Sullivan filed an application for rehearing, which the Alabama Court denied.

### H.  State Motion for Post-Conviction Relief

Sullivan filed a <u>pro</u> <u>se</u> petition for post-conviction relief in Alabama Circuit Court pursuant to Alabama Rule of Criminal Procedure 32 and subsequently amended the petition. In his amended Rule 32 petition Sullivan argued, <u>inter alia</u>, that his trial counsel, John T. Kirk ("Kirk"), was ineffective for failing to interview or call Sullivan's daughter Renee as a witness during the trial. At the time of the murder, Renee was five years old, and Sullivan claimed she witnessed his fight with Smith. The state circuit court held a hearing at which most of Sullivan's subpoenaed witnesses, including Kirk, failed to appear. Sullivan asked that the

state circuit court admit Renee's testimony to support his claim that Kirk was ineffective, but the state circuit court refused to hear her testimony, stating that "[i]t doesn't have anything to do with the ineffective assistance of counsel, what she may have witnessed," and her testimony was not important because they were not going to retry the case.

The state circuit court denied Sullivan's petition, and he appealed to the Alabama Court of Criminal Appeals. Sullivan argued that, although he had advised Kirk that Renee was a witness three months before trial and asked Kirk several times during trial to call her as a witness, Kirk failed to interview her or to investigate the information she had. Sullivan maintained that the lower court erred in denying his Rule 32 petition without hearing Renee's or Kirk's testimony. The state prosecutor conceded that the case should be remanded for entry of a final order with specific fact findings.

The Alabama Court of Criminal Appeals remanded the case for the state circuit court to state with particularity its reasoning and findings for denying Sullivan's Rule 32 petition. On remand, the state circuit court issued a brief order stating that Sullivan failed to establish by a preponderance of the evidence that he was entitled to relief for ineffective assistance of counsel. The Alabama Court of Criminal Appeals affirmed without substantial discussion.

## I. § 2254 Petition

On May 8, 1996, Sullivan filed in federal district court a petition for habeas relief pursuant to 28 U.S.C. § 2254. In his § 2254 petition, Sullivan argued, <u>inter alia</u>, that Kirk provided ineffective assistance of counsel in failing to call Renee as a witness or to interview her even though she was the only one to witness Smith's death.

Sullivan attached to his § 2254 reply brief a transcript of a deposition given by Renee in 1995, when she was eleven years old. Thus, Renee's deposition was taken over five years after the murder. In the deposition, Renee stated that on the day Smith died, Smith and Janice were talking in the back yard of Kitty's house while Renee climbed a tree. When the defendant Sullivan arrived at Kitty's house, Janice told Smith to leave, but he refused and hid by the side of the house. Renee and her mother Janice went inside.

As to the outbreak between Sullivan and Smith, Renee testified in the deposition: "Mike [Smith] jumped on my daddy [Sullivan], and my daddy jumped on him. Mike stabbed my daddy, and then my daddy stabbed him." Renee then stated that she went into Kitty's house as Sullivan went to the backyard, and thereafter Renee watched her father only from a window. According to Renee, her daddy (Sullivan) walked to the side of the house where Smith was hiding, and

15

Smith jumped on Sullivan. Renee testified that when Smith jumped on her daddy (Sullivan), the two men fell to the ground, rolled around, and stabbed each other, but Smith stabbed Sullivan first. According to Renee, Smith got the knife "out of his back pocket" and had his knife out first, but then her daddy (Sullivan) pulled out his knife after Smith jumped on and stabbed him. According to Renee, Smith stabbed her daddy (Sullivan) three or four times in the stomach.

## J.    First District Court Order

On May 13, 1999, the magistrate judge entered a report and recommendation (the "First R&R"), which recommended that Sullivan's § 2254 petition be denied without a hearing. With regard to Sullivan's claim that Kirk was ineffective in failing to call or interview Renee, the magistrate judge determined that Sullivan failed to show either that Kirk's performance was deficient or that he suffered prejudice. Specifically, the magistrate judge found that Renee's deposition, "while appearing rehearsed regarding some questions, is inconsistent and overall confusing." The magistrate judge also stated:

> Additionally, the statement, taken five years after the events occurred, may bear little resemblance to any statement the child may have given at the time of the murder. The failure of [Kirk] to call [Renee] does not appear unreasonable. . . . [E]ven if [Kirk's] actions in failing to call [Renee] could be deemed deficient, [Sullivan] fails to show that there is "a reasonable probability that, but for [Kirk's] unprofessional errors, the results of the proceedings would have been different."

16

Sullivan objected to the First R&R, arguing that he was entitled to an evidentiary hearing because he had shown that Kirk's failure to interview Renee and call her as a witness prejudiced Sullivan's case and the facts were not adequately developed in the state court post-conviction proceedings. However, the district court adopted the First R&R, denying Sullivan's § 2254 petition. Sullivan applied for a certificate of probable cause ("CPC"), which the district court granted.

### K.    First Appeal to This Court

Sullivan then appealed the denial of his § 2254 petition to this Court on several grounds. This Court affirmed the district court's denial, except that we vacated and remanded as to Sullivan's claim of ineffective assistance of counsel in Kirk's not interviewing or calling Renee as a witness. Specifically, we concluded: "Contrary to the suggestion by the magistrate judge, the testimony is clear with respect to the crucial matter of who started or provoked the altercation between the victim and Sullivan." Because the magistrate judge's dismissal of this claim "rested primarily, if not entirely, upon his misinterpretation of the daughter's testimony," we vacated the district court's judgment and remanded for further proceedings only as to that claim. This Court stated that it was expressing no opinion about the merits of Sullivan's claim. This Court also noted that Kirk did

17

not testify at the state post-conviction evidentiary hearing and that on remand, the district court should "conduct a thorough analysis as to whether or not an evidentiary hearing in federal court is appropriate."

### L. Evidentiary Hearing in District Court

On remand, the magistrate judge appointed counsel to represent Sullivan and held an evidentiary hearing in 2001 on Sullivan's § 2254 petition, at which Renee testified. Renee testified that she was then 17 years old and was 5 years old at the time Smith died. Renee testified that she was at Kitty's home on the day in question, and she played in a tree in the backyard while Janice and Smith talked beside that tree. Renee saw Smith wearing a knife on a holder in his belt that day. Renee testified that Sullivan came out to the backyard after arriving at Kitty's, and Janice went into the house. Janice thought Renee had gone into the house, but instead, Renee followed Sullivan back out into the backyard and saw Sullivan walk toward the side of the house, where Smith was standing.

Renee testified that Smith jumped on Sullivan, coming at Sullivan with his "knife held high," as follows:

Q. What did you see next?
A. Mike [Smith] jumped on him.
Q. Okay, tell us what you saw.
A. Mike came out with his knife held high.
Q. And you say he came out, was there some place that he was inside? You say he came out. Was he in --

18

A.     He jumped from the side of the house.

According to Renee, the two then fell to the ground, rolled around, and fought. Renee could not tell exactly what was occurring between Sullivan and Smith because they were "too tightly wrapped." According to Renee, Smith had a knife while the two fought, but was hitting Sullivan with the hand holding the knife. Renee did not see Smith strike or cut Sullivan with his knife. Renee saw Sullivan with his own knife after a minute or two, although she did not see Sullivan pull it out. Renee watched for a few minutes, but Janice returned to the backyard and took her into the house. Renee then went to one of the bedrooms and watched the fight from a window, but she watched through the window only for a very short time because Janice retrieved her and locked them both in a bathroom. The next time Renee saw Sullivan, he was getting into his truck, and his shirt was covered in blood and had a hole in it.

Kirk testified that his memory was very sketchy, but he said he investigated the scene of the incident, spoke with the police officers assigned to the case, and interviewed "just about everybody that was suggested to me to be a witness to that incident or possessed information about the deceased Michael Smith, and folks that knew Mr. Sullivan and Janice." Kirk could not remember many facts about the

19

trial, such as whether Sullivan's daughters[4] testified; nor could he remember appearing or arguing at a motion for new trial, whether he interviewed Kitty's then-boyfriend David Hyatt, or what had happened to the majority of his case file.

In response to questioning about whether the defendant Sullivan ever told Kirk that Smith was the attacker, Kirk replied that he understood that Sullivan went to Kitty's home "reasonably assured" that he would find Smith there with Janice and that the defendant Sullivan did not tell him that Smith attacked. In describing Sullivan's account of the facts to Kirk, Kirk stated Sullivan "went in the backyard for a very specific purpose," expecting to find Smith there, and "[h]e was not attacked by Mr. Smith." Kirk testified that Sullivan's chief defense was heat of passion, and Kirk attempted to get the verdict reduced to manslaughter. No one ever came forward to say that Smith attacked Sullivan. Kirk also testified that he found nothing to indicate that Smith had a knife on that day.

Kirk testified that he had interviewed Janice and Kitty Sullivan and that, to his knowledge, there were no eyewitnesses other than Sullivan. Janice, Renee's mother, supplied a list of names of individuals who had information for the trial, but Renee was not on Janice's list. Janice did not describe anyone as an eyewitness. Kirk further testified that the evidence did not indicate that Renee saw

---

[4]In addition to Renee, Sullivan has two other daughters.

anything, and moreover, Sullivan specifically told Kirk that Renee did not witness the fight. Kirk was surprised when Kitty testified that Renee was standing at the back door when Sullivan walked outside and at that point, he probably asked the defendant Sullivan at trial whether Renee was at the back door, and Sullivan probably answered in the negative, but Kirk could not remember. Kirk acknowledged that he had interviewed children in preparation for other cases, generally while their parents were present, but stated that he would not have taken it upon himself to interview Renee because he "would not do that to a child."

Sullivan testified that he never barred Kirk from speaking with his children, and he asked Kirk to speak with Renee in the days preceding the trial. Sullivan stated that he asked Kirk approximately three to six times during trial to put Renee on the stand, but Kirk put him off. Sullivan did not think that Janice prevented Kirk from interviewing Renee. Sullivan stated that Kirk probably did not remember being told that he should interview Renee or have her testify because Sullivan said he did not press the matter with Kirk "[o]ut of respect."

As to April 27, 1989, Sullivan testified in 2001 that Smith had a knife at the fight. However, Sullivan admitted that he did not tell Kirk about Smith's knife because he did not remember the details of the fight for approximately a year and a half after his conviction. Sullivan also did not tell Kirk that his memory was

21

incomplete because he did not realize it at the time. On cross-examination, Sullivan clarified that Smith had jumped on him from the side towards his back, and Sullivan glimpsed Smith's knife. Sullivan stated that during the fight the two never stood up. Sullivan believed Smith dropped his knife because Sullivan did not see it again, but he was not sure what had happened to Smith's knife. Sullivan testified that he had a slight cut on his stomach, and he remembered wounding Smith in two places.

## M.    Second R&R and Supplemental R&R

After further briefing by both parties, the magistrate judge issued a second report and recommendation ("Second R&R"), recommending that Sullivan's § 2254 petition be denied. The magistrate judge found that two statements were made at trial by the prosecutor and Kirk that no eyewitnesses existed, but Sullivan did not speak up at those times. Next, the magistrate judge determined that a reasonable attorney could have decided that he should not call Renee to testify under any circumstances. The magistrate judge noted that Renee had testified Smith had a knife but that the medical and testimonial evidence, including Sullivan's own account of the event at trial, contradicted Renee's testimony and vitiated the credibility of Renee's testimony. The magistrate judge thus found that based on the totality of the evidence, Kirk's actions were reasonable and not

22

deficient performance.

The magistrate judge also noted that there was no evidence that Kirk's actions prejudiced Sullivan because there was no reasonable possibility, after comparing Renee's testimony to the remainder of the evidence, of a different outcome at the trial. The magistrate judge stated that there was no dispute in the evidence about whether Smith jumped Sullivan as he went into the back yard, and that fact did not ameliorate the consequences of Sullivan's drawing his knife when he and Smith broke apart during the fight. And as noted earlier, Renee's testimony that Smith was armed with a knife was contrary to all the physical evidence and even Smith's testimony at trial. That inconsistency, along with multiple inconsistencies between her testimony at ages 11 and 17, convinced the magistrate judge that there was no probability the jury would have credited her testimony.

After Sullivan filed objections to the Second R&R, the magistrate judge issued a supplemental report and recommendation ("Supplemental R&R"), finding, inter alia, that a portion of Sullivan's testimony indicated that he had told Kirk that Renee was an eyewitness, but Sullivan's admission that he did not press the point with Kirk "border[ed] on the incredible." The magistrate judge further determined that Renee's "testimony was so contrary to the evidence . . . that there [was] no reasonable probability" of a different outcome.

23

## N.    District Court Order

After Sullivan objected to the magistrate judge's Supplemental R&R, the district court asked the parties to brief additional issues.  Subsequently, the district court denied Sullivan's § 2254 petition, adopting the Second R&R and Supplemental R&R to the extent they found that Sullivan did not show the required prejudice.  The district court found that the physical and medical evidence did not support Renee's version of events.  The district court stressed that "Sullivan himself [testified] that he never saw a knife, and certainly never testified that Smith attacked him with his 'knife held high.'"  The district court thus determined, based on the inconsistences between Renee's testimony that Smith first attacked Sullivan with a knife and the other evidence in the case that showed no knife was found on Smith, that Sullivan failed to establish prejudice under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984).

However, the district court found that Sullivan did tell Kirk that Renee was an eyewitness to the fight because the magistrate judge did not expressly reject Sullivan's testimony on this point.  Nevertheless, the district court chose not to rule on whether Kirk's performance was reasonable or deficient.

Sullivan filed a notice of appeal and applied for a certificate of appealability ("COA"), which the district court denied.  This Court granted a COA on the issue

of "[w]hether trial counsel was ineffective for failing to interview Renee Sullivan, or to call her as a witness at trial?"

## II. STANDARD OF REVIEW

In reviewing a district court's denial of a § 2254 habeas petition, we review questions of law and mixed questions of fact and law de novo. LeCroy v. Sec'y, Fla. Dep't. of Corr., 421 F.3d 1237, 1259 (11th Cir. 2005), cert. denied, 126 S. Ct. 1458 (2006). We review findings of fact only for clear error. Id.[5]

## III. DISCUSSION

The only issue on appeal is whether Sullivan's trial counsel was constitutionally deficient in failing to interview Renee Sullivan or call her as a witness. We first outline the legal principles governing ineffective assistance claims and then apply those principles to Sullivan's claim.

### A.    Governing legal principles

"It is well established that the Supreme Court's decision in Strickland is the 'controlling legal authority' to be applied to ineffective assistance of counsel claims." Robinson v. Moore, 300 F.3d 1320, 1343 (11th Cir. 2002) (quoting

---

[5]In this case, the state does not claim that we should apply the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") to any state court rulings. Rather, both parties on appeal raise only issues as to the district court's findings and conclusions after its evidentiary hearing, and both parties agree on the standard of review of the district court's fact findings and conclusions of law. Thus, given how the parties have chosen to litigate the case, we do not address AEDPA.

25

Williams v. Taylor, 529 U.S. 362, 406 120 S. Ct. 1495 (2000)). To prevail, a petitioner "must show both incompetence and prejudice." Chandler v. United States, 218 F.3d 1305, 1312 (11th Cir. 2000) (en banc).

The standard governing counsel's performance is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688, 104 S. Ct. at 2065. "The purpose of ineffectiveness review is not to grade counsel's performance," but to determine whether that performance fell within the broad range "of what might be a reasonable approach at trial." Chandler, 218 F.3d at 1313. "To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" Id. (quoting Burger v. Kemp, 483 U.S. 776, 107 S. Ct. 3114, 3126 (1987)). The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable. Id. at 1313-14.

"[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (quotation marks and citation omitted). "[B]ecause counsel's

26

conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." Chandler, 218 F.3d at 1315.

As for the second prong, "[a] petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is high." Robinson, 300 F.3d at 1343-44 (quotation marks, citation, and punctuation omitted). "Under the prejudice prong of Strickland, it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Grayson v. Thompson, 257 F.3d 1194, 1225 (11th Cir. 2001) (quotation marks and citation omitted). Instead, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Chandler, 218 F.3d at 1312-13 (quotation marks and citation omitted). This prejudice burden is heavy where the petitioner alleges ineffective assistance in failing to call a witness because "often allegations of what a witness would have testified to are largely speculative." United States v. Guerra, 628 F.2d 410, 413 (5th Cir. 1980).[6]

**B.    Failure to Interview or Call Renee**

---

[6]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Sullivan's argument is that Kirk knew that Renee was present at the scene of Smith's death and, accordingly, that he was ineffective in failing to interview her to determine what she saw. The district court denied Sullivan's § 2254 petition based on Sullivan's failure to establish prejudice and did not address the performance prong of Strickland. Because we agree with the district court that Sullivan failed to establish prejudice, we affirm on that ground and do not address the performance prong. See Strickland, 466 U.S. at 697, 104 S. Ct. at 2069 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

As explained above, to meet Strickland's prejudice prong, Sullivan must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Chandler, 218 F.3d at 1312-13 (quotation marks and citation omitted). Sullivan argues on appeal that Renee was the sole eyewitness to the fight and her testimony would have supported his argument that Smith was the initial aggressor and attacked Sullivan first with a knife.[7] Thus, Sullivan argues, there is a reasonable probability that, had his trial

_____

[7]There is a factual issue whether Renee actually saw the start of the fight. Under one version of the evidence, she was out in the back yard when the fight started, but there was also evidence that she was already at the back door of Kitty's house or perhaps already inside the house. For purposes of this appeal, we assume Renee saw the start of the fight. The inconsistencies over where Renee was would further weaken her testimony, however.

28

counsel interviewed Renee and called her as a witness at trial, the jury first would have believed Renee and therefore then would have believed his self-defense argument, or at least convicted him of manslaughter in the heat of passion rather than murder.

Sullivan's argument fails because Renee's testimony wholly lacked credibility for several reasons. First, Renee changed her story and gave inconsistent versions of what happened at the scene. For example, Renee testified in her 1995 deposition – given six years after the murder, when she was eleven years old – that Smith pulled a knife from his back pocket and then attacked Sullivan, stabbing him three or four times. However, at the 2001 evidentiary hearing, at age seventeen, Renee changed her story, testifying that she never saw Smith strike or cut Sullivan with Smith's knife. Renee also maintained at the 2001 hearing that Smith initiated the encounter by coming at Sullivan with his "knife held high," as opposed to pulling his knife from his back pocket. In addition, Renee changed her story as to where she was when the fight first started. In her 1995 deposition, she testified that as Sullivan went outside, she and her mother Janice went inside, and she watched Smith attack Sullivan from a window. However, in 2001, Renee testified that only her mother went inside and that although her mother thought she followed her, Renee stayed outside and saw Smith

29

jump out with his knife held high and land on her father.

Second, even setting aside the obvious inconsistencies in Renee's own testimony, both of Renee's accounts are entirely inconsistent with the physical and testimonial evidence presented at trial. For example, photographs of the defendant Sullivan taken the day after the murder, when he turned himself in to police, establish that Sullivan suffered no stab wounds, but only a single, minor scratch across his stomach. The photographs of Sullivan are in marked contrast with those of Smith's body, which reveal seven deep, gaping wounds over Smith's body that resulted in his death, not to mention numerous less severe cuts, abrasions, and bruises. The photographs negate Renee's 1995 deposition testimony that Smith had a knife and stabbed Sullivan multiple times. While this may help explain why Renee changed her story at the 2001 hearing and testified that she never saw Smith strike or cut Sullivan, Renee's change in her story, along with the photographs, together significantly undermine her credibility.

Moreover, although Renee claimed Smith had his own knife, no knife was discovered on Smith's body or at the scene, and none of the other witnesses who were at Kitty Sullivan's house the day of the murder saw Smith with a knife any time that day. Indeed, even Sullivan himself admitted three times at trial that he did not see Smith with a weapon, that Smith never was in control of Sullivan's

30

knife, and that the scratch across Sullivan's stomach was inflicted by Sullivan's own knife as the two struggled. Sullivan also never claimed that Smith ever stabbed him.[8] In light of Sullivan's testimony at trial that he did not see a knife on Smith and the clear evidence that Smith did not use his knife against Sullivan, neither version of Renee's testimony – that Smith attacked Sullivan with his "knife held high" or that Smith stabbed Sullivan multiple times – is credible.

In addition, Dr. Lauridson, the state medical examiner, testified that in light of the extent and nature of Smith's seven deep, gaping stab wounds, one of which was on Smith's back, it was "highly unlikely" that the wounds were inflicted as two individuals rolled on the ground or by a person defending himself against the victim, as Renee testified. Dr. Lauridson's testimony, along with the photographs, establishes a one-sided attack by Sullivan against Smith and not the type of struggle described by Renee. In short, none of the trial evidence supported Renee's version of the facts, and overwhelming evidence contradicted it.

Finally, we can only speculate as to which version of Renee's testimony would have been offered had she been called to testify in Sullivan's trial. See

---

[8]We understand Sullivan's argument that he could have acted in self-defense if he reasonably feared that Smith had a knife and would harm him with it, even if Smith did not actually have a knife. However, Renee testified that Smith had a knife and drew his knife first. That testimony was crucial to her story, and the fact that all the other evidence contradicts that testimony is highly relevant to her credibility and thus the value of her testimony.

31

Guerra, 628 F.2d at 413. All we have is her 1995 deposition and 2001 evidentiary hearing testimony, and that testimony is inconsistent. Perhaps her testimony in 1990 would have been different from that in 1995 and 2001. But even assuming that Renee would have testified at trial in full support of her father's self-defense story, as set forth in either her deposition or her evidentiary hearing testimony, we conclude that Renee's testimony lacked credibility for several reasons. As such, Sullivan has not carried his burden to show a reasonable probability that Renee's testimony would have changed the outcome of his trial. See Thompson v. Nagle, 118 F.3d 1442, 1453 (11th Cir. 1997) (affirming denial of habeas corpus petition because potential witnesses, who were not called and whose testimony allegedly would have testified in petitioner's favor at trial, were not believable); Wiley v. Wainwright, 793 F.2d 1190, 1194-95 (11th Cir. 1986) (same). To support a different outcome based on Renee's testimony, the jury would have had to reject the substantial physical and other testimonial evidence presented at trial in favor of a six-year-old girl's inconsistent testimony about an altercation that she allegedly witnessed a year before and upon which her father's freedom depended. Simply put, Sullivan has failed to establish a reasonable probability of such a result. Accordingly, we conclude that the district court correctly determined that Renee's testimony lacked credibility and thus that Sullivan has failed to establish that he

32

was prejudiced by his trial counsel's failure to interview Renee or call her as a witness at trial.[9]

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Sullivan's § 2254 petition.

**AFFIRMED.**

---

[9]The dissent acknowledges that "[t]he inconsistencies regarding whether or not Smith had a knife indicate that Renee's testimony would arguably not have changed the outcome with regard to Sullivan's self-defense claim." Dissenting Op. at pg. 36. The dissent argues instead that Renee was consistent in her testimony that Smith was the aggressor and that her testimony on that one point could have changed the outcome from murder to manslaughter. What the dissent ignores is that Renee's testimony wholly lacked credibility. Her changed testimony itself and the overwhelming physical and testimonial evidence refuting it – including Sullivan's own trial testimony – did not simply undermine her credibility on isolated points; it made her wholly unbelievable. Accordingly, Sullivan has failed to establish a reasonable probability that Renee's testimony would have affected the outcome of his trial.

WILSON, Circuit Judge, dissenting:

William L. Sullivan is an unsympathetic criminal defendant who killed a man. The majority opinion makes that clear in its description of the facts. Yet, the Sixth Amendment to the United States Constitution entitles him to "the Assistance of Counsel for his defense", and the Supreme Court has interpreted that to mean the "effective" assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). Sullivan's only defense to the charge of first degree murder was that he acted in self-defense, and there was a crucial witness available to testify in support of this defense. His lawyer's failure to interview the **only** eyewitness who could corroborate Sullivan's claim of self-defense is surely ineffective assistance of counsel.

Kirk's ineffective performance prejudiced Sullivan. Understandably, the majority focuses only on *Strickland*'s prejudice prong in finding that Sullivan failed to prove ineffective assistance of counsel. The majority must focus on the prejudice prong because Kirk's actions were utterly ineffective under *Strickland*'s performance prong. As the majority notes, the district court found that Kirk was aware that Renee was the only eyewitness and never interviewed her. A lawyer making a strategic decision not to put a witness on the stand can many times be defended as reasonable. *See, e.g.*, *Alexander v. Dugger*, 841 F.2d 371, 375 (11th

34

Cir. 1988).  A lawyer can rarely, however, claim that it is reasonable never even to talk to the only eyewitness to the events surrounding the alleged crime. Determining the facts is the most basic requirement of being able to mount an effective (or even a competent) defense.  *See House v. Balkcom*, 725 F.2d 608, 618 (11th Cir. 1984) ("Pretrial investigation, principally because it provides a basis upon which most of the defense case must rest, is, perhaps, the most critical stage of a lawyer's preparation.").  A lawyer does not have to explore every hypothetical situation that could have possibly occurred.  *Id.*  If a lawyer, however, is aware that there is only one eyewitness to the events at issue, the lawyer should at the very least find out what that witness saw.  *See id.* ("While we do not require that a lawyer be a private investigator in order to discern every possible avenue which may hurt or help the client, we do require that the lawyer make an effort to investigate the obvious.").  Kirk did not do this and thus failed his duties to his client.[1]

I disagree with the majority's conclusion that Renee's testimony would not have mattered.  The majority holds that Renee's testimony, even if admitted at

---

[1]Amazingly, Kirk tried to defend his decision by relying on Renee's age.  Imagine if the state adopted a similar view–people could commit murder and have the police interview no eyewitnesses if the only eyewitnesses were young children.  We would be outraged at a prosecutor who failed to interview a sole child eyewitness in a murder case; we should be equally intolerant of a defense attorney who blunders just as egregiously.

35

Sullivan's trial, would not have changed the outcome because of its internal

inconsistencies and inconsistencies with the rest of the evidence regarding whether

Smith had a knife. Indeed there were inconsistencies between Renee's testimony

that Smith had a knife and the overwhelming evidence indicating that he did not.

The majority fails to recognize, however, that Renee's testimony was entirely

consistent with Sullivan's claim that Smith, with or without a knife, was

nevertheless the aggressor. Both times when Renee offered sworn testimony, she

testified that Smith attacked Sullivan first.

The inconsistencies regarding whether or not Smith had a knife indicate that

Renee's testimony would arguably not have changed the outcome with regard to

Sullivan's self-defense claim.[2] Nevertheless, because Renee's testimony was

unwaveringly consistent with Sullivan's claim that Smith was the aggressor, there

is still a reasonable probability that the jury could have, at the least, found that

Sullivan was moved to act by "a sudden heat of passion caused by provocation

recognized by law" and reduced the verdict to manslaughter if presented with

Renee's testimony. Ala. Code §§ 13A-6-2(b); 13A-6-3(a)(2).[3] At one point during

---

[2]Although even this is debatable. The police indeed never recovered the knife that Renee claimed Smith had. However, they never recovered Sullivan's knife either. The absence of the knife does not definitively mean that it did not exist.

[3]Sullivan received a sentence of life imprisonment for first degree murder. If convicted of manslaughter, he would have been sentenced to a maximum of 20 years imprisonment. Ala. Code §§ 13A-6-3(b); 13A-5-6(a)(2). Had this been the case, Sullivan would be close to

oral argument, the state, which appeared more focused on arguing that Kirk's representation satisfied *Strickland*'s performance prong, even conceded that prejudice existed if one assumed inadequate performance:

> Court: Let's assume that this defense attorney, what's his name, Tommy King?
> State: Uh, Kirk.
> Court: Tommy Kirk. He had interviewed this little girl, and he had decided, "She's going to help my client. I'm gonna put her on the witness stand." She'd taken the witness stand and she'd testified that Smith was the aggressor, and not Sullivan, and Sullivan was defending himself. If she had testified to that, could that have led to a conviction of a lesser charge like manslaughter, or even, uh, an acquittal?
> State: Yes.[4]

The Supreme Court provides that prejudice takes place when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Given the great potential that Renee's eyewitness testimony had to affect the outcome of Sullivan's case by supporting a conviction of a lesser included charge, which would have resulted in a shorter sentence,

---

completing his sentence because he was sentenced on April 16, 1990.

[4]When pressed on this issue, the state back-pedaled from this statement without any clear explanation, perhaps realizing that this concession was completely inconsistent with the state's position that, even if Sullivan's counsel's failure to interview Renee satisfied *Strickland*'s performance prong, such failure would not have prejudiced Sullivan.

37

confidence in the outcome of the proceeding is undermined.

Because Renee was the sole eyewitness and consistently supported Sullivan's claim that Smith was the aggressor, Kirk's failure to so much as interview her undermines the outcome of the case and prejudiced Sullivan. *See Sanders v. Cook*, 99 Fed. Appx. 778, 781 (9th Cir. 2004) (unpublished memorandum) (state court erred in finding that failure to interview and call sole eyewitness was not prejudicial "[i]n a case in which the determinative question was whether the defendant intended to discharge the weapon, and where only the testimony of the eyewitnesses was capable of providing direct evidence as to how the discharge occurred"); *see also, e.g,. Riley v. Payne*, 352 F.3d 1313, 1321 (9th Cir. 2003) ("Counsel's unexplained failure to interview a witness who would have said that the victim in anger threatened to shoot Riley undermines our confidence in the jury verdict rejecting Riley's plea of self-defense. We conclude, that . . . Riley was prejudiced by Clower's omission."); *Anderson v. Johnson*, 338 F.3d 382, 393-94 (5th Cir. 2003) (counsel's failure to interview one of two adult eyewitnesses was ineffective assistance of counsel); *Chambers v. Armontrout*, 907 F.2d 825, 831 (8th Cir. 1990) (en banc) (counsel's failure to interview only eyewitness who could have corroborated defendant's claim of self-defense was ineffective assistance of counsel); *Mitchell v. Ayers*, 309 F. Supp. 2d 1146, 1156

(N.D. Cal. 2004) (attorney's failure to interview "an available witness who would have corroborated petitioner's otherwise uncorroborated testimony as to the reason petitioner entered the Gonzalez home, specifically, that he did so out of fear for his safety and not for the purpose of committing theft" was ineffective assistance of counsel that prejudiced petitioner).

Although I lament the logistical inconvenience of re-trying Sullivan so long after the events have taken place, this does not excuse the constitutional violation. Sullivan, unbecoming though he may be, still deserved effective representation. He did not receive it, and to say that he did is to render ineffective assistance of counsel claims virtually meaningless. I would therefore remand the case to be re-tried so that Sullivan can have his day in court with at least the minimum level of effective representation the Constitution guarantees.