UNITED STATES of America,
Plaintiff-Appellee,

v.

James Wade CAWLEY [1] and Lou Wiggs,[2] Defendants-Appellants.
No. 72–2418.

United States Court of Appeals, Fifth Circuit.

July 3, 1973.

Rehearing Denied Aug. 1, 1973.

1. This appellant was indicted as James *Collie.* Following some confusion as to the correct name and apparently an arrest and rearrest he filed a plea in abatement, which led to a stipulation that the indictment was corrected without objection to read James Cawley and the plea in abatement being marked "disposed of by agreement." The Appendix indicates that he was sentenced as "James Cawley," but notice of appeal from the judgment of conviction was given by James Wade Cawley. He will be referred to in this opinion simply as *Cawley.*

2. This appellant was indicted, tried and sentenced as *Lou* Wiggs. He filed notice of appeal from the judgment of conviction as *Lew Wiggs.* He will be referred to in this opinion simply as *Wiggs.*

H. Thomas Hirsch, Odessa, Tex., for defendants-appellants.

William S. Sessions, U. S. Atty., Jeremiah Handy, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before ALDRICH,[2a] SIMPSON and CLARK, Circuit Judges.

SIMPSON, Circuit Judge:

Cawley and Wiggs appeal from their convictions following a joint trial before a jury. Cawley was convicted under Counts One, Two, (as an aider and abettor, Title 18, U.S.C. Sec. 2) Three, Four and Five, of a six-count indictment. He was not named in Count Six. He received confinement sentences of five years under Count One, and ten years under each of the remaining counts, subject to the indeterminate parole provisions of Title 18 U.S.C. Sec. 4208(a)(2), all sentences to run concurrently. Wiggs was convicted under Counts One, Two, Three and Four, the only counts under which he was charged. His concurrent confinement sentences, also subject to Title 18 U.S.C. Sec. 4208(a)(2) were respectively to five years, six years, six years and six years. Count One charged Cawley and Wiggs, together with two others not on trial, Travis Calvin Henderson (Henderson hereinafter) and June Teagarden Hunsanger Capps (Mrs. Capps hereinafter) along with an unindicted co-conspirator, James Clarence Weeks, with Conspiracy, Title 18 U.S.C. Sec. 371, to violate counterfeiting statutes of the United States, Title 18 U.S.C. Secs. 471, 472, 473 and 474, by making, concealing and possessing counterfeit $10, $20 and $100 Federal Reserve notes, by concealing and possessing plates for the printing of such counterfeit money and by transferring and delivering counterfeit notes. Counts Two, Three, Four, Five and Six were substantive counts. Count Two charged Wiggs and Mrs. Capps with making counterfeit notes, in violation of Title 18 U.S.C. Sec. 471, and charged Cawley and Henderson with aiding and abetting the commission of such offense in violation of Title 18 U.S.C. Sec. 2. Count Three charged the same four defendants with possession of counterfeit notes, in violation of Title 18 U.S.C. Sec. 472. Count Four charged these four persons with possessing counterfeit plates from which counterfeit notes had been printed, in violation of Title 18 U.S.C. Sec. 474. Henderson and Cawley were charged under Count Five with delivery of $4,800 in counterfeit money to James Clarence Weeks, in violation of Title 18 U.S.C. Sec. 473. Henderson was charged under Count Six with delivery of $6,000 in counterfeit notes to Weeks, also in violation of Title 18 U.S.C. Sec. 473.

After consideration of the several issues raised on appeal, we affirm the convictions of both Cawley and Wiggs.

The first question raised by the appellants is claimed error in the denial

2a. Hon. Bailey Aldrich, Senior Circuit Judge of the First Circuit, sitting by designation.

of their pre-trial motion for a continuance in order to obtain two witnesses, Stroud and Weaver, whom they regarded to be "essential" to their defense. Appellants recognize that the granting of such a motion is a matter within the sound discretion of the trial court, United States v. Harrelson, 5 Cir. 1973, 477 F.2d 383, 384, decided May 4, 1973; United States v. Fuentes, 5 Cir. 1970, 432 F.2d 405, 407–408, cert. denied, 1971, 401 U.S. 919, 91 S.Ct. 904, 27 L. Ed.2d 822; but suggest that it was erroneous abuse of such discretion to deny the request here where, they assert, they showed who the witnesses were, what their testimony would be and that it would be competent and relevant to the issue of their guilt, that the witnesses could probably be obtained if the continuance were granted, and that due diligence had been used to obtain their attendance on the day set for trial. United States v. Harris, 10 Cir. 1971, 441 F. 2d 1333, 1336; Blackwell v. United States, 5 Cir. 1969, 405 F.2d 625, 627, cert. denied, 395 U.S. 962, 89 S.Ct. 2104, 23 L.Ed.2d 747; Leino v. United States, 10 Cir. 1964, 338 F.2d 154, 156. Appellants urge Stroud and Weaver were essential and material witnesses to their defense because they were involved with counterfeit money produced from the same plates used by the government as exhibits against them.

The evidence at trial indicated that appellants printed numerous bills which were not used because they were apparently dissatisfied with their quality. There was no evidence to show that these bills were in fact destroyed, thus leaving open the possibility that Stroud and Weaver could not fully exonerate

appellants as they contend or even otherwise offer testimony relevant to their cause. In addition, there was unrefuted government testimony that Stroud was a fugitive from justice, raising a strong inference that he could not be produced as a witness at a later trial date. Of even more significance, there was no evidence from any source that either Stroud or Weaver would have testified to incriminating circumstances leaving them open at least to a charge of possession of counterfeit money in violation of Title 18 U.S.C. Sec. 472. Assuming their production at a later trial, their willingness to testify was completely unascertainable. United States v. Pollack, 5 Cir. 1970, 427 F.2d 1168, 1169. Abuse of the trial judge's discretion in denying appellant's motion for a continuance is not made to appear.

■ Appellants next contend that the trial court erroneously denied their motions for new trial on the ground of newly discovered evidence, such evidence being that their co-defendant Mrs. Capps was promised a dismissal of several counts of the indictment in return for her testifying as a government witness. A month before appellants' trial Mrs. Capps entered a guilty plea to Count One, the conspiracy count of the indictment. At the time her plea was accepted she stated that she had been promised nothing in exchange either for her plea of guilty or for an agreement to testify on behalf of the government at appellants' trial. During the trial of Cawley and Wiggs, Mrs. Capps affirmed this by testifying that she was not promised anything in return for her testimony or for her guilty plea and had received nothing.[3] But in August 1972,

---

3. Mrs. Capps' testimony on cross-examination included the following:
 "Q Have you ever talked to the Secret Service Agents about this matter?
 A Yes, sir.
 Q And you knew at the time you were talking to them that you were a Defendant in the case?
 A Yes, sir.
 Q I note today that you are not being prosecuted on it. Can you tell me why?

 A No, sir.
 Q Well, you talked to the Secret Service people, didn't you?
 A Yes, sir.
 Q Did they promise you anything for your testimony?
 A No, sir.
 Q Have you plead guilty to this case?
 A Yes, sir.
 Q What did you receive?

several months after trial, the Assistant U.S. Attorney who prosecuted the case testified at a hearing on appellants' motion for a new trial that he expected to dismiss the remaining counts of the indictment at Mrs. Capps' sentencing in return for her guilty plea to the single conspiracy charge, Count One. It was brought out at this hearing that a pre-sentence report as to Mrs. Capps had not been completed as of the trial date in March 1972, so that the trial judge was at that time unready to sentence her. Appellants argue that this exercise in "plea bargaining" was in fact an inducement for Mrs. Capps to testify at their trial for the government, her previous denials to the contrary notwithstanding, and that such information if known to the jury would affect Mrs. Capps' credibility as a witness. They rely on the teachings of Giglio v. United States, 1972, 405 U.S. 150, 92 S.Ct. 763, 31 L. Ed.2d 104, as entitling them to a new trial.

In *Giglio* it was learned after trial that the key government witness, who was Giglio's alleged co-conspirator and the only witness linking Giglio with the crime, had been promised freedom from prosecution in return for his co-operation with the government despite direct representations to the contrary at trial. The Supreme Court reversed the conviction and order a new trial because the nondisclosure by the government of this evidence affected the credibility as a witness of one without whom "there could have been no indictment and no evidence to carry the case to the jury." 405 U.S. at 154, 92 S.Ct. at 766, 31 L. Ed.2d at 109.

■ We had recent occasion to apply *Giglio* in United States v. Tashman and Goldberg, 5 Cir., 478 F.2d 129 (decided May 18, 1973). There, under vastly different circumstances, we ordered a new trial. A co-defendant of the appellants there, Osbrach, agreed to plead guilty to one count of a two-count indictment, to testify against his co-defendants Goldberg and Tashman, and to provide the government with "valuable" information in return for a government recommendation to the court as to his sentence in a secret pre-trial proceeding from which Goldberg, Tashman and their counsel were excluded. The plea proceedings were sealed by the trial judge at the request of counsel for Osbrach. Osbrach testified at trial against his codefendants without their counsel being advised of the nature of the secret proceedings. We stated broadly, citing *Giglio*, that "the failure of the Government to disclose to a jury plea-bargaining negotiations with a key witness deprives a defendant of constitutional due process." The holding of Tashman was required because the jury was unaware of the interest that may have influenced Osbrach's testimony. In fact he had an agreement with the government to testify against his co-defendants in return

A I received nothing, sir, other than I pleaded guilty.
Q You have not been tried yet? Is that what you are telling me?
A Yes, sir.
Q Do you ever expect to be tried?
A Yes, sir.
MR. HANDY:
Wait a minute, Your Honor, I would interpose an objection and let counsel get the chronology of events. It is my understanding when an individual pleads guilty, that is the trial and all that is left to be done is sentencing which naturally flows therefrom.
THE COURT:
Yes, sir, a plea of guilty has the same force and effect as a trial before a Court and jury.

MR. ALLISON:
That's true, Judge, and I was trying to break it down into the vernacular of the jury. We understand when you plead guilty it is a trial. I understand that, sir.
THE COURT:
It is the same as being tried before a Court and jury.
MR. ALLISON:
Thank you, sir.
BY MR. ALLISON:
Q Have you told all that you know about this case?
A Yes, sir."
 * * * * *

for the plea. We read *Giglio* and *Tash-man and Goldberg* to mean simply that the jury must be apprised of any promise which induces a key government witness to testify on the government's behalf.

Here Mrs. Capps consistently stated —at the taking of her plea under the rigorous examination by the judge required by Rule 11, F.R.Crim.P., at appellants' trial and again at the hearing on

motion for new trial—that she was promised nothing for her plea of guilty or for testifying against appellants. The testimony of the prosecutor was not to the contrary. He testified that prior to appellants' trial the government offered Mrs. Capps the opportunity to plead guilty to any one of the four counts with which she was charged, with the reading of the indictment as to its remaining parts being waived.[4] She did

4. We set forth here the pertinent testimony at the hearing on motion for new trial of the Assistant U. S. Attorney, Mr. Handy:

"Q In so far as Mrs. Capps is concerned, I believe the record reflects that she was re-arraigned in February, about a month before the March trial, is that correct?

A She was re-arraigned on February 10, 1972 here in San Antonio, Texas in this courtroom.

Q All right. And at that time, you dismissed all of the counts against her with the exception of the conspiracy count, is that correct?

A No, that is not correct. I will elaborate. She entered a plea of guilty to the conspiracy count. We waived the reading of the remaining counts of the indictment in which she was named. Those counts were not dismissed until after she was sentenced.

Q All right.

A Which is the normal procedure followed virtually 100 per cent in every case I have ever handled.

Q All right. In February then of 1972, is that the first time you discovered that Mrs. Capps would be a prosecution witness?

A On February 10th

Q Yes, sir.

A No. On November the 9th, 1971, which I believe that that date is correct, she and her attorney came to Midland. That's the date of the motions in the case. Through her attorney she had indicated that she wished to cooperate with the Government. I had not seen her and never talked to the woman prior to that particular time. I walked into the office. She was there with her attorney. She said she would like to cooperate and testify for the Government. So I asked Mr. Patterson to sit down with her and find out what the facts of the case that she would be testifying to. And that's what he did. I introduced myself to her. I left, and I believe went back to the courtroom in as much as the Cramer case was

coming up for trial either before or after we had motions. I don't remember which.

And I think I saw her leave. I don't believe I had any more of a conversation with her at that time. Mr. Patterson came back to me and said that he believed that she would make a good witness on the trial of the case and that the testimony that she could give would be helpful to the Government.

Q All right, sir. And for the purpose of the record, you are speaking of Mr. Bill Patterson or William Patterson and he is a Treasury Agent?

A Right. United States Secret Service stationed out of Lubbock, Texas.

Q And he was November 1971 and he still is a representative of that agency?

A That is correct.

Q All right. Now then, you say that you did not sentence Mrs. Capps until after she testified?

THE COURT:
He doesn't sentence Mrs. Capps.

MR. HIRSCH:
Sir?

THE COURT:
He doesn't sentence Mrs. Capps.

MR. HIRSCH:
I beg your pardon. That was—

THE COURT:
The Court sentenced Mrs. Capps.

MR. HIRSCH:
That was faulty wording on my part. I beg your pardon.

BY MR. HIRSCH:

Q Mrs. Capps was not sentenced until after the March trial, is that correct?

A That is correct, along with all of the other Defendants. They were set down by the Court at a normal sentencing date.

Q But she did plead guilty before this Court in February?

A That is correct. February the 10th, 1972. I believe that's correct.

Q And the other parts of the indictment were waived except—

A Just waived the reading of them. Yes, that is correct.

not then agree to testify against Cawley and Wiggs although she had indicated a willingness to do so. Defense counsel were notified over a week before trial, on February 28, 1972 that Mrs. Capps had pled guilty to Count One and that she would be a government witness at trial. Nor did the Assistant U.S. Attorney offer to make any recommendation as to sentencing. He categorically stated that nothing more than this classic or "pure" plea bargain took place.

Q Would it be a true statement that Mrs. Capps did not receive any sentence at that time in order that the Government could control her testimony in March?

THE COURT:

Wait just a minute. You are testifying to something that isn't so. This Court never sentences anybody without a pre-sentence report. And it takes a month to six weeks to two months as a rule to get that. So I wouldn't sentence her under any circumstances at that time. And I hadn't taken into account as to whether I was going to accept any recommendation for a dismissal on the other counts which were not read. I just took the plea on that one count. Now, that was all.

BY MR. HIRSCH:

Q All right, sir. Mr. Handy, did you enter into any kind of an agreement with Mrs. Capps' attorney prior to the March 1972 trial?

A Nothing other than what I have just testified to.

Q Did you ever talk to him?

A. Oh, yes, sir.

Q There was no plea bargaining of any kind or any type with Mrs. Capps' attorney?

A In the sense that the Government offered to allow her to plead guilty to one of the counts of the indictment, at which time we, at the time of the plea, we would waive the remaining counts. In this particular indictment, and you perhaps can correct me if I am wrong, the maximum punishment on some of the substantive counts was fifteen years. One of them may have been ten years. And the conspiracy was five years. And I believe that the general offer I made was I would allow her to plead to any one of the counts of the indictment, and we would waive all of the remaining counts. As you well know, some Defendants are more comfortable pleading to different kind of counts. It's just a matter of choice. You read the word conspiracy to them and they become excited about that word and it could lead to something else. So to me it didn't make any difference. The Government was interested in a plea and the offer was made for one count in the indictment which was accepted by the defense. They made the decision on which count it would be.

Q The offer was made and accepted prior to March 1972, was it not?

A Yes, sir.

Q So in truth and in reality, Mr. Handy, there had been some deal made, and I use the word deal not in a malicious tone but just because it's the best word I can use but there had been some agreement made between the Government and Mrs. Capps' attorney that she was going to plead guilty to one count, that being the conspiracy, and the reading of the indictment would be waived insofar as her being named in the remaining parts of the indictment and as far as the Government is concerned she was only going to be pleading guilty to that one count and not the rest of them?

A That is what the Government offered and that was what was accepted by the Defense.

MR. HIRSCH:

That's all we have of this witness, Your Honor.

\* \* \* \* \*

MR. HANDY:

Yes, I had better clear up for the record

\* \* \*

As to Mrs. Capps, specifically with respect to her, I made no representation or promises of any kind to her other than the offer and acceptance of the plea to the one count of the indictment as previously testified to, and that is essentially—

THE COURT:

I think when I accepted the plea I made the statement to her at that time before I would accept the plea, it had to be unequivocally and voluntarily with full understanding of the nature and consequences. And I made it perfectly plain in the record, I'm sure if you'll get that record, that I had no idea what sentence to impose on her, and I wouldn't know until I had the pre-sentence report from the probation officer. And if there was any deal made, the Court wasn't aware of it. And I made it plain to her that when she plead guilty, it was without benefit of any promise or any inducement to cause her to plead guilty. Now the record will reflect exactly what I said in that regard. But I know I did make that as a condition of accepting her plea of guilty."

That is to say there was no agreement with the government, as there was in *Giglio* for the witness to avoid prosecution in return for testimony for the government at the trial of another wrongdoer. There was no agreement as in *Tashman* for the co-defendant to plead guilty to a single count in return for testimony. Such a promise was denied both by the witness and the prosecutor under oath. We cannot infer on this record that such a promise was made.

■ "Plea bargaining" has been recognized as an "essential component of the administration of justice" and, when "[p]roperly administered," should be encouraged. Santobello v. New York, 1971, 404 U.S. 257, 260, 92 S.Ct. 495, 498, 30 L.Ed.2d 427, 432; Brown v. Beto, 5 Cir. 1967, 377 F.2d 950, 956–957. Here it appears the inducement was reduction in the offense charged and the prosecution fulfilled its promise. Mrs. Capps' testimony in appellants' trial was not a part of that bargain. Her cooperation with the government was separate and independent from the bargain, although realistically she may have hoped for a favorable sentence.

Ample opportunity was allowed at trial for appellants to explore the motivation behind Mrs. Capps' testifying for the government and thereby to attempt to discredit her testimony. She had been named as a co-defendant in the same multi-count indictment as they and had pled guilty to one of those counts a month before trial. Counsel was at trial in no way discouraged from bringing this fact to the jury's attention. It cannot be demonstrated that Mrs. Capps testimony at trial was false in any particular. We will not hold the trial court in error under the circumstances present here for the denial of appellants' motion for a new trial.

■ Cawley and Wiggs further contend that the trial court erred by refusing to grant a new trial based upon claimed newly discovered evidence that the government witness Weeks, named in the indictment as a co-conspirator under Count One, and as a receiver of counterfeit money from Henderson and Cawley under Count Five and as a receiver of counterfeit from Henderson under Count Six, had never been charged with any crimes whatsoever despite self-incriminating testimony at their trial and that such information, with its attendant inference of government inducement to testify, should have been before the jury. It is well settled, however, that the United States has wide discretion in determining whether a prosecution against a particular individual shall be commenced or maintained. See United States v. Hancock, 5 Cir. 1971, 441 F.2d 1285, 1287, cert. denied 404 U.S. 833, 92 S.Ct. 81, 30 L.Ed. 2d 63; United States v. Cox, 5 Cir. en banc 1965, 342 F.2d 167, 171, cert. denied sub nom. Cox v. Hauberg, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700. Appellants were fully apprised in advance that Weeks would be a witness for the government. The fact that he stood unindicted was a known and legitimate basis for cross-examination as to possible interest when he testified at trial. United States v. Rodriguez, 5 Cir. 1971, 437 F.2d 940, 941, F.R.Crim.P. 33.

■ The appellants finally argue that they should have been granted a new trial because of the false testimony of a material witness against them. At trial Mrs. Capps testified that the counterfeit printing plates had been placed in a garbage can on July 13, 1969, and then loaded in the back of an ambulance to be taken away and destroyed and that she had never seen them since. Coldwell, the owner of the print shop where the counterfeit notes had been produced, testified that when he learned of the illegal activities conducted within his shop he was upset and immediately told the offenders to refrain from such behavior in the future, and that they did so to his knowledge. At the August 1972 motion for new trial hearing appellants produced testimony from Ophelia Goodson, an employee of the print shop, to the effect that she had discovered an aluminum counterfeit twenty dollar plate in a

remote location in the shop in late August or early September 1969. This was six weeks or more after the plates were supposed to have been destroyed. She said she quit Coldwell's employ immediately without disclosing her find until she gave defense counsel an affidavit in late May, two months after the trial. Cawley and Wiggs assert that this newly discovered evidence tended to rebut the testimony of Coldwell and if available at trial, would have entitled them to an instruction by the court that Coldwell was an accomplice to the acts charged. We reject this contention.

Coldwell's testimony showed nothing more than that near the end of July he became aware for the first time that counterfeiting operations had been conducted in his print shop earlier that month and that he told those involved to desist from such activities in the future. The presence of a counterfeit printing plate in his shop some weeks thereafter was not proof of the falsity of his testimony since there was no evidence that he was aware of the plate's presence. This newly discovered evidence tended to corroborate other evidence that counterfeiting activities had been conducted within Coldwell's printing establishment, nothing more. This evidence was cumulative only and would not have warranted an accomplice charge as to Coldwell's trial testimony. The trial judge correctly rejected this as an inadequate basis for granting a new trial. Mesarosh v. United States, 1956, 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L.Ed.2d 1, 7; and see United States v. Sposato, 2 Cir. 1971, 446 F. 2d 779, 781–782 and cases cited therein.

■ We deal now with two contentions advanced individually by Cawley. First, Cawley separately urges that the prosecuting attorney commented upon his failure to take the stand in his own behalf in violation of his Fifth Amendment right against self-incrimination, and that the trial judge's failure to declare a mistrial vitiated his conviction. Griffin v. California, 1965, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106. Government's witness Weeks testified as a part of the government's proof under Count Five, that he was in the presence of Cawley and co-defendant Henderson in August 1969 when Henderson reached into a hole in the ceiling of an office of the Baker Ambulance Service, operated by Cawley and his brother, and removed a batch of counterfeit money. In an effort to discredit Weeks' testimony, appellants called Deputy Sheriff Olesh as a witness. He stated that he found no such hole in the ceiling when he examined that office overnight during the trial in March 1972, at defense counsel's request. In final argument the prosecutor stated that Cawley or someone in association with him would best know whether or not there was a hole in the ceiling in the summer of 1969.[5]

Government counsel's argument was in answer to defense counsel Hirsch's argument comment upon the non-existence of a hole in the ceiling of the Baker Ambulance Service office to the effect that there never has appeared to be a hole there as far as Deputy Olesh was concerned, and further: "What happened to the hole? That's where the money was supposed to have been taken out of—there isn't any. There never has been".

There was no motion for mistrial. Instead, the argument was objected to on non-specific grounds and the trial judge sustained the objection, admonishing the government attorney to get off the subject of the hole in the ceiling. There was no further comment about the hole and the judge directed the jury to disregard the comments with respect to it. Additionally as a part of the general

5. The comment by the prosecutor was as follows:

But my question to you and the observation that bothers me is who best knows about whether the ceiling is in the condition that it is. Mr. Olesh? He doesn't own the Baker Ambulance Service. He may go down by there once or twice, but he doesn't own it. *Who knows about that ceiling? I would say it is Mr. Cawley or someone in association with him.* You haven't heard anything about the condition of that ceiling back a year and a half in 1969 during the summer. (Emphasis added).

charge the jury was instructed not to draw any inference of guilt from the defendants' failure to take the stand in their own behalf. United States v. Taitano, 4 Cir. 1971, 442 F.2d 467, 469.

Defense counsel got all he asked for when the incident occurred. We do not consider the incident of sufficient gravity for us to invoke the plain error rule, Rule 52(a), F.R.Crim.P., and hold the trial court in error for failing to declare a mistrial *sua sponte*. This is so, particularly since the prosecutor's comment was at least as much directed to the defense's failure to call Cawley's brother and partner to the stand as to call Cawley as a witness for himself. Samuels v. United States, 5 Cir. 1968, 398 F.2d 964, 969, cert. denied 1969, 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566.

We come finally to Cawley's separate contention that the evidence was insufficient to sustain the verdict of guilty as to Count Five, which charged Henderson and Cawley jointly with the delivery and transfer, with intent to defraud, of approximately $4800 of counterfeit Federal Reserve Notes to Weeks, on or about August 12, 1969, and that the trial judge should have entered a judgment of acquittal as to that count. We think that, viewed in the light most favorable to the government, Glasser v. United States, 1944, 315 U.S. 60, 62 S. Ct. 457, 86 L.Ed. 680, the evidence as to Count Five was sufficient. The testimony of Weeks was to the effect that Henderson physically removed the counterfeit notes from the loft in the office of Baker Ambulance Service and handed them to him in the presence of Cawley, and that Cawley then went outside, stating that "he didn't care about knowing anything about whatever kind of deal was made and he left and he went outside." Despite this disclaimer, Cawley advanced money to Henderson and Weeks for a trip to dispose of the money. Cawley admitted at the time of his arrest his financial interest in the deal. Mrs. Capps testified as to Cawley's presence when she was called by Wiggs and Henderson to come to Coldwell's print shop and help fix the press, at the time counterfeit money was being printed with a special kind of green ink from the counterfeit plates in evidence. Mrs. Capps said the printing operation took over three hours as the press kept jamming. She was present also the next day when Coldwell confronted Wiggs and Cawley with his knowledge that his press had been used. This was sufficient to warrant a jury finding that Cawley took part in the delivery of the money to Weeks with the requisite intent to defraud.

We note alternatively that since Cawley received concurrent ten year sentences for his conviction under the substantive counts of the indictment, Counts Two, Three, Four and Five, and the evidence under each of Counts Two, Three and Four was amply sufficient to support Cawley's conviction, we do not need to consider the claimed deficiency of the proof as to Count Five. The concurrent sentence doctrine makes it unnecessary. United States v. Stone, 5 Cir. 1973, 472 F.2d 909; United States v. Payne, 5 Cir. 1972, 467 F.2d 828; United States v. Vigo, 5 Cir. 1970, 435 F.2d 1347.

The judgments of conviction appealed from are in all respects

Affirmed.