[DO NOT PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 22-10020

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JOSEPH JOHN DEBLASI,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 1:21-cr-00011-AW-GRJ-1

————————————————

Before LUCK, LAGOA, and TJOFLAT, Circuit Judges.

PER CURIAM:

Joseph Deblasi appeals his conviction for possessing methamphetamine with the intent to distribute it, arguing that the district court abused its discretion by denying his motion for a second midtrial continuance so that he could try to secure testimony from a favorable witness. Because the district court did not abuse its discretion, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On December 29, 2020, an officer with the High Springs Police Department was out on patrol when she saw a Jeep blow right through a stop sign. Cecilla Wyatt was behind the wheel, and Deblasi was riding shotgun. The officer immediately chased after the two and pulled them over. Just as the Jeep was stopping, the officer saw Deblasi's arm move toward the passenger's window moments before a baggie with a white substance fell to the ground. The officer walked up to the driver's side of the Jeep and asked for the registration. Deblasi, whose father owned the Jeep, used one hand to get the registration from the center console while he used his other hand to hide a gray bag in the console.

Deblasi and Wyatt were arrested at the scene. The baggie Deblasi threw out the passenger window had 66.6 grams of methamphetamine in it. The gray bag Deblasi tried to hide had plastic baggies, a scoop spoon with residue, and a scale, and a search of the rest of the Jeep turned up a glass pipe with blue liquid, four cell

phones, and a book bag holding two canisters of Narcan[1] and a ledger. Six of the ledger's pages recorded what seemed to be drug sales.

The grand jury indicted Deblasi on March 23, 2021, for possessing methamphetamine with the intent to distribute it, in violation of 21 U.S.C. sections 841(a)(1) and (b)(1)(A)(viii). Following four continuances and the withdrawal of two of Deblasi's attorneys, his trial was set for six months later.

Shortly after his appointment, Deblasi's third attorney tried to interview Wyatt, but she refused to talk with him. Since she wouldn't tell him anything, Deblasi's counsel decided not to subpoena Wyatt, thinking she was "better off as a government witness." The government agreed and subpoenaed Wyatt to testify at trial.

The trial started on October 4, 2021. About five hours into the first day, after jury selection, Deblasi's counsel told the district court that during the lunch break Deblasi's sister sent counsel text messages between the sister and Wyatt from the day before. In the text messages, Wyatt confessed to Deblasi's sister that the "dope" the police found was hers and that Deblasi didn't know she had it. According to Wyatt, on the day of the arrest, she told Deblasi—who had just woken up when the two were getting pulled over—to open his door and that she, not Deblasi, threw the baggie out of the Jeep. That was different from the story Wyatt told nine months

---

[1] A medicine used to counter the effect of opioids in the event of an overdose.

earlier after she and Deblasi were arrested.  Back then, while Wyatt was still in jail after her arrest, she was recorded on jail calls insisting that the drugs weren't hers.  Those calls included one she made right after she was arrested, where she claimed to have "no idea" about the drugs found near the Jeep.

Deblasi's sister asked if Wyatt planned to tell the jury that the meth was hers, and Wyatt replied that she wasn't sure what to do but that she "d[idn't] wanna go to jail."  Still, Wyatt told the sister, there was "no way [Wyatt] could live with [herself] if [Deblasi] had to take the punishment" for her.  Deblasi's sister encouraged Wyatt to reach out to Deblasi's counsel because the trial was set to start the next day.  Wyatt responded with a simple, "Okay."

Because of the text messages, Deblasi's counsel moved for a midtrial continuance so he could investigate calling Wyatt as a witness.  For its part, although the government had subpoenaed Wyatt, it doubted she would show up to trial because she stopped answering the government's calls the week before.  Even so, the government didn't object to the continuance.

The district court, while concerned "about wasting [the jury's] time" and "letting a third party . . . disrupt [the] trial schedule" with a midnight hour confession, granted Deblasi's counsel a continuance.  It dismissed the jury for the day, quickly addressed an evidentiary issue with the parties, and let Deblasi's counsel use the rest of the day to reach out to Wyatt.

The next morning, Deblasi's counsel explained that he'd spoken to Wyatt the day before and that she confirmed what was in

the text messages with Deblasi's sister. Wyatt told Deblasi's counsel that she knew she was subpoenaed to testify and that she would show up to trial that day even though her testimony would incriminate her. But that was yesterday. By the next morning, Wyatt had "again fallen off the grid."

Deblasi's counsel moved for a second midtrial continuance "until such time as [Wyatt's] appearance could be secured." This time, the government objected to the continuance, arguing that Wyatt had already been subpoenaed and talked to both Deblasi's sister and counsel. As the government saw it, if Wyatt ever planned to testify, she would do so that day.

The district court denied counsel's second midtrial continuance motion. While the district court found that Deblasi's counsel had been diligent in trying to get Wyatt to testify, it also found that Wyatt was not "some surprise, out-of-the-blue witness"; everyone knew about her connection to the case from the start. And even if Deblasi's counsel could get Wyatt on the stand, the district court found that she was entitled to invoke her Fifth Amendment right against self-incrimination, "in which case . . . she wouldn't testify." In the absence of any "concrete indication" that Wyatt would appear and testify, the district court concluded that a second midtrial continuance would "just giv[e a] third party the authority to interfere with th[e] case" and "give[ a third party] a lot of power" to delay the trial with a last-minute confession not offered in court.

As the second day of trial continued, the district court repeatedly checked in with the parties about Wyatt. The first time

came after the government's first witness—the officer who pulled over Deblasi and Wyatt.  The district court asked if either party knew where Wyatt was.  They didn't.  Though both Deblasi's counsel and the government could get an address for Wyatt, they couldn't be sure where she was right then.

After a short recess, the district court asked for another update on Wyatt.  The government told the district court that the address it had for Wyatt wasn't her own—it was her mother's house, where Wyatt "mostly stay[ed]."  When the government served its subpoena three weeks earlier, it did so at a gas station.  More recently, though, Wyatt had been heard on jail calls saying she was staying with "Little Dilly," a person the government knew nothing about.  The only lead the government had on Little Dilly's identity was that Wyatt might know a man named "Dillon," but the government didn't have Dillon's last name or address.  Picking up on the government's lead, Deblasi's counsel made a call and narrowed Dillon's address down to a specific apartment complex, but counsel couldn't get anything more specific than that.  Without a specific address, there wasn't enough to find Wyatt and get her to testify.

Five more government witnesses testified over the next hour of trial.  The district court asked about Wyatt a third time just before it recessed for lunch.  Deblasi's counsel didn't have much of an update—as he told the court earlier, he only knew the name of someone he thought Wyatt was staying with and the apartment complex where they might be found.  The district court asked about counsel's previous conversations with Wyatt, and Deblasi's

counsel explained that they'd spoken the day before and that she told him she would be there for the second day of trial. But, just as counsel had told the district court earlier, Wyatt changed course the morning of the second day. When Deblasi's sister followed up with Wyatt about giving Wyatt a ride to trial, Wyatt didn't reply. And when Deblasi's counsel tried to follow up with Wyatt, he got the same response—nothing.

Deblasi's trial continued for another four hours before the jury began its deliberations. During that time, the government called two more witnesses, the parties delivered their closing arguments, and the district court gave its instructions to the jury. Wyatt never showed.

Following his conviction, Deblasi appeals the denial of his second midtrial continuance motion.

## STANDARD OF REVIEW

We review a district court's denial of a continuance for an abuse of discretion. *United States v. Khan*, 794 F.3d 1288, 1311 (11th Cir. 2015).

## DISCUSSION

Where a district court denies a continuance so a defendant can obtain testimony from an absent witness, we generally look to four factors to determine whether the denial was an abuse of discretion: (1) the diligence of the defendant in interviewing the witness and procuring her testimony; (2) the probability of obtaining the testimony within a reasonable time; (3) the specificity with

which the defendant was able to describe the witness's expected knowledge or testimony; and (4) the degree to which the witness's testimony was expected to be favorable to the defendant and the unique or cumulative nature of the testimony. *United States v. Alejandro*, 118 F.3d 1518, 1523 (11th Cir. 1997). Applying these factors here, we conclude that the district court did not abuse its discretion in denying Deblasi's second midtrial continuance motion.

### 1. *Deblasi's Diligence in Interviewing Wyatt and Procuring Her Testimony*

As to the first factor, we have repeatedly held that a defendant is not diligent when he fails to subpoena a witness to secure her attendance at trial. *See United States v. Holt*, 777 F.3d 1234, 1268 (11th Cir. 2015) ("[The defendant] indicated that she had not timely subpoenaed witnesses, showing a lack of diligence."); *Alejandro*, 118 F.3d at 1523 ("[D]ue diligence required that a subpoena be issued to secure [the witness's] attendance."); *United States v. Uptain*, 531 F.2d 1281, 1285, 1289 (5th Cir. 1976) ("doubt[ing]" that the defendant was diligent when he "ha[dn't] subpoenaed and interviewed" the witnesses). That's what happened here—over the span of six months, four continuances, and three lawyers, Deblasi never subpoenaed Wyatt. And, as the district court found, Wyatt wasn't "some surprise, out-of-the-blue witness." She was the only other person in the Jeep when the drugs were found. It was not diligent to wait until the first day of trial to try to subpoena Wyatt to testify.

*2. The Probability of Obtaining Wyatt's Testimony in a Reasonable Time*

As to the second factor, there is no indication that a witness's testimony can be obtained in a reasonable time when no party "kn[ows the witness's] exact whereabouts and attempts made during trial to locate h[er] were unproductive," *United States v. Costello*, 760 F.2d 1123, 1126–27 (11th Cir. 1985), or when the defendant cannot "indicate precisely when [the] witness would be available" to testify, *cf. United States v. Moriarty*, 497 F.2d 486, 490 (5th Cir. 1974). That was the case when Deblasi moved for his second midtrial continuance. By the time Deblasi made his second midtrial continuance motion, Wyatt had stopped talking to the government and Deblasi, neither party knew her exact whereabouts, Deblasi hadn't been able to find her, and no one knew when she could be found.

Also, the incriminating nature of Wyatt's testimony made it unlikely she would show up to court. *Cf. United States v. Cawley*, 481 F.2d 702, 705 (5th Cir. 1973) (explaining there was "no evidence . . . that [the witnesses] would have" incriminated themselves and "their willingness to testify was completely unascertainable"). Here, as the district court found, Wyatt could have refused to incriminate herself, and that finding was supported by the record. Wyatt told Deblasi's sister that she "d[idn't] wanna go to jail," stopped talking to Deblasi, his sister, and the government, and, even though she was subpoenaed, she did not show up to testify.

And there was no indication that Wyatt's testimony could be obtained in a reasonable time because the district court had already

granted Deblasi one midtrial continuance that proved unsuccessful. When reviewing the denial of a continuance to obtain "allegedly exculpatory documents," we've made clear that a district court does not abuse its discretion if the defendant already attempted to obtain the evidence and he "could not demonstrate that his future efforts would be any more successful than those in the past." *United States v. Bergouignan*, 764 F.2d 1503, 1508 (11th Cir. 1985). The same was true in Deblasi's trial. The district court gave Deblasi much of the first trial day to find Wyatt, and, by the time he moved for a second midtrial continuance, he still hadn't located Wyatt or knew whether she would testify.

Deblasi responds that it was "reasonable to assume" Wyatt's testimony could be secured in a reasonable time because the parties had her phone number, her mother's address, and the name and apartment complex of someone she might have been staying with. But Deblasi had the same information during two days of trial, and he still couldn't find Wyatt or get her to show up to trial. That's the best evidence that she probably wasn't going to testify.

### 3. The Specificity with Which Deblasi Was Able to Describe Wyatt's Expected Knowledge or Testimony

The third factor weighs in a defendant's favor when he can proffer what the witness would say if called to testify. *See Hicks v. Wainwright*, 633 F.2d 1146, 1149 (5th Cir. Unit B Jan. 1981) (holding this factor weighed in the defendant's favor when he proffered the specific testimony the witness would give); *Dickerson v. Alabama*, 667 F.2d 1364, 1370 (11th Cir. 1982) (holding the defendant offered

"a clear indication" of the witness's testimony when he proffered that the witness would establish his alibi). Here, Deblasi was clear about what Wyatt would say on the stand. He provided copies of, and told the district court about, the text messages between Wyatt and Deblasi's sister. Unlike the first two factors, the third favors Deblasi.

### 4. The Degree to Which Wyatt's Testimony Was Expected to Be Favorable to Deblasi

Finally, Wyatt's expected testimony was not all that favorable to Deblasi because her last-minute confession contradicted what she said on jail calls after she was arrested. After Wyatt's arrest, she consistently said that the drugs weren't hers. And she specifically told one person she called right after her arrest that she had "no idea" about the drugs found near the Jeep. Because Wyatt's expected testimony would have been heavily impeached with her earlier statements, her testimony would not have moved the ball significantly for Deblasi. *Cf. Sullivan v. DeLoach*, 459 F.3d 1097, 1110 (11th Cir. 2006) (holding a habeas petitioner did not demonstrate a reasonable probability that he would have been acquitted where his counsel did not call a witness who "lacked credibility" in part because she "changed her story and gave inconsistent versions of what happened").

⋆ ⋆ ⋆

Taken together, the district court did not abuse its discretion in denying Deblasi's second midtrial continuance motion. Besides specifically describing Wyatt's expected testimony, Deblasi was not

diligent in securing her testimony at trial, her testimony could not have been obtained in a reasonable time, and her testimony would not have been all that favorable to Deblasi. Like here, where three of the four factors weighed against another continuance, we have found no abuse of discretion. *See Costello*, 760 F.2d at 1126–27 (holding that the district court did not abuse its discretion where, "[l]eaving aside the question of diligence, the other factors . . . countenanced against another continuance" (footnote omitted)). We reach the same conclusion here.[2]

## CONCLUSION

Because the district court did not abuse its discretion in denying Deblasi's second midtrial continuance motion—Deblasi's only basis for challenging his conviction—we affirm.

**AFFIRMED**.

---

[2] Deblasi also argues that the district court abused its discretion because, instead of considering the four factors, it only considered "the convenience of the . . . jury" when denying his motion. But that argument ignores the district court's reasons for denying the second midtrial continuance motion. The district court didn't consider the convenience of the jury at all; the only time the district court referenced the jury's convenience—when it said it didn't want to "wast[e the jury's] time"—was when it *granted* Deblasi his first midtrial continuance. The district court considered several factors when denying Deblasi's second midtrial continuance motion, including that Wyatt wasn't a surprise witness, could invoke her Fifth Amendment right if called to testify, and gave no indication she would show up to trial.

LAGOA, Circuit Judge, concurring:

I concur with the majority's conclusion that the district court did not abuse its discretion in denying Deblasi's motion for a continuance. I write separately, however, to reiterate what I made plain at oral argument: the government, in this case, failed to prioritize the pursuit of truth over the pursuit of a guilty verdict.

**I.**

As the majority explains, this appeal arose from the district court's denial of a motion for continuance during trial.

Deblasi was indicted for possessing methamphetamine with the intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii). After several continuances, his trial was set for October 4, 2021. On October 1, 2021, the government filed its witness list, which included Cecilla Wyatt. Wyatt had been driving the car in which Deblasi, her front-seat passenger, was arrested following a traffic stop. On October 3, 2021, Deblasi filed his own witness list, which included "[a]ny and all witness [sic] disclosed by the Government or called during its case in chief, in rebuttal or otherwise."

After jury selection, but before the jurors were sworn, the district court recessed for lunch. When they reconvened, Deblasi's lawyer, Wilson, told the court that Deblasi's sister contacted him during the break. The sister told Wilson that she had received some text messages from Wyatt earlier that day or the night before. Wilson described the texts to the district court as follows:

[T]he text messages basically exonerate Mr. Deblasi, and [Wyatt] says that the drugs were hers; he knew nothing about it; he was asleep; they got stopped, and then she threw the drugs out the door when the vehicle is stopped and that he had no knowledge of the presence of the drugs in the vehicle.

He also read one of the texts, which said, "You know, I don't know what to do. I don't want to go to jail, but I don't want him to go to prison for something he didn't do," and characterized another as saying, "The day that we got arrested, the stuff that they found was mine." Wilson explained to the district court that he had tried to interview Wyatt during his investigation but "she refused to talk to [him]." Wilson acknowledged that, while these statements "would operate as a complete defense," Wyatt "could certainly invoke her right to remain silent," and stated that "if we go forward with trial . . . there could be an injustice done. . . . [W]e have someone who's actually coming forward . . . and has made statements that completely support what our defense would be, without having the opportunity to talk with her." The government, for its part, stated that it "candidly [did not] know exactly what the best course of action" was. The Assistant United States Attorney, Byron, told the court that the government had subpoenaed Wyatt and had been in some contact with her, but "she essentially stopped returning phone calls." Based on her "complete radio silence," Byron kept Wyatt on the witness list on the "outside chance" that she would show up to trial. Byron also confirmed that the government was not aware, prior to these text messages from Deblasi's sister to

22-10020                    LAGOA, J., Concurring                    3

Wilson, that Wyatt would testify to "anything other than 'I don't know what happened.'"

After a brief recess, Wilson told the district court that he "could not agree to go forward with the trial, simply because of the fact that now . . . there's a witness, who is a government witness," who he needed to speak to. As for how Wyatt could be tracked down, Wilson admitted that he did not "quite know how to do that yet except . . . she's under subpoena . . . by the government." Wilson reiterated his due diligence in trying to speak to Wyatt, efforts which she had rebuffed. Ultimately, Wilson asked the court for a brief continuance and stressed that "they're the ones that have her under subpoena, and I don't know if they've tried to contact her and say, 'what exactly is going on,' because that may be something that can help the situation forward. . . . They have a lot more ammunition in that part than I would." The district court clarified that this information had flowed from Wyatt to Deblasi's sister to Wilson and had not been discovered by the government.

The district court then turned to the government for its view. Byron confirmed that the government had subpoenaed Wyatt but that she had stopped responding to phone calls and text messages the week before trial. He said that he had "a hard time imagining that she is going to come to this courtroom, take the stand and admit to conduct for which she could be indicted," but also agreed that the text messages "are highly exculpatory if true and if believed."

4                    LAGOA, J., Concurring                    22-10020

The district court then weighed the practical concerns of jury convenience and other witnesses' schedules and expressed some hesitation about "letting a third party . . . disrupt our trial schedule . . . by coming in with this 'Well, I did it' thing on the eve of or the day of trial." The court concluded that they would begin trial the following morning instead so that Wilson could have the afternoon to try and locate Wyatt. In doing so, the district court commented that "there's no sense in waiting indefinitely" if Wyatt was not willing to speak to either side.

The next morning, Wilson advised the district court that he had spoken to Wyatt the prior afternoon. Wilson told the court that Wyatt "acknowledged and confirmed the content of the text messages" and said that "she had sent those text messages because it's, in fact, the truth." Wilson also noted that Wyatt confirmed she had received the subpoena but "felt that she was being hounded and pressured by the government and she just didn't want any part of that, so she basically went off the grid as far as the government is concerned." Wyatt told Wilson that she would "absolutely" come to court to testify that day, despite the risk of self-incrimination. However, Wilson said that as of that morning, Wyatt had "again fallen off the grid." Wilson then argued that Wyatt was a material witness and suggested that she be taken into custody and brought in to testify. Wilson suggested two pathways forward. First, he suggested he might bring the text messages in as statements against interest under Rule 804, but he acknowledged that he would need to bring in a witness (Deblasi's sister) to authenticate them. Second, and absent the ability to introduce the text

22-10020                LAGOA, J., Concurring                5

messages, Wilson admitted that he did not "feel comfortable going forward" without Wyatt. To that end, Wilson argued that Wyatt was a material witness and "should be taken into custody and brought here . . . . But [he] [did not] know if [he had] the power to do that." He ultimately requested a continuance until such time as Wyatt's appearance could be secured.

When the district court asked Byron for the government's position, he immediately conceded "the seriousness of the importance of this to the defense case, if true, and if Ms. Wyatt is ever actually going to appear in court." Byron expressed concern, however, that Wyatt may have never "intended anything more than to throw a wrench into the government's case by claiming custody of drugs at the eleventh hour" when she previously denied all knowledge. He also stated that, if Wyatt did testify, that would put the government in the position of "having to open the door to rebuttal evidence that could be substantial" about her prior inconsistent statements. As to the likelihood of Wyatt appearing and testifying, Byron took the position that "If she's going to show, today will be the day," and maintained that "the best course forward is to proceed with trial today."

Wilson raised another point: the subpoena to which Wyatt was subject was "a court order . . . not a government order," meaning that "the Court has the ability to enforce that and compel her attendance." The district court, in response, clarified that the instrument was "the government's subpoena" and "if they are not seeking to pursue it at this time, then that's kind of where we are."

Ultimately, the district court said that Wyatt was not a surprise witness and that both parties had been given an opportunity to investigate her anticipated testimony and, accordingly, found no basis to continue the trial. In saying so, the district court specifically stated that it did not mean to suggest that Wilson had not been appropriately diligent—but, rather, that the court was not inclined to give a third-party control over the trial calendar. After denying the motion for continuance, the district court reserved the idea of a motion to take Wyatt into custody for a break later in the day.

As planned, during a break in the government's case in chief a few hours later, the district court raised "the request to take Ms. Wyatt into custody" and asked Wilson if anyone knew where Wyatt could be found. Wilson pointed out that the government (who had served Wyatt with the trial subpoena) had an address for her. The district court then asked the government for its position, and Byron responded as follows:

> Your Honor, as I've advised the Court, TFO Houston served Ms. Wyatt. Candidly, I don't intend to call her as a witness because I don't believe she's going to present truthful testimony, and I'm not going to put that before the Court. So I'm not asking [for] her to be brought to court. I'm not asking for a warrant to be sent.

The district court pressed further, asking the government, "But is there any reason why she shouldn't be brought in?" Byron reiterated his "strong reservations about whether [Wyatt would] testify truthfully," but conceded that he could not "think of anything"

22-10020                LAGOA, J., Concurring                7

else.  After a brief recess, the district court asked the government if it knew where Wyatt was.  Byron explained that the agent who served Wyatt's subpoena reported that Wyatt had been staying with her mother as of a few weeks prior to trial, but that the agent had served Wyatt at a nearby gas station where she had agreed to meet.  Byron also informed the district court that, based on some recent jail calls, the agent believed Wyatt had been staying with someone named "Little Dilly."  Byron and the agent told the court they could provide Wyatt's mother's address, but not Little Dilly's.  Wilson then asked the district court's permission to make a quick phone call and, when he returned, he offered that he could "narrow [Little Dilly's address] down to an apartment complex," but not a specific apartment.  The district court reserved ruling on the motion to enforce the subpoena and brought the jury back in to resume trial.

When the jury stepped out for lunch, the discussion of Wyatt resumed.  Wilson did not have any new information and was still working on tracking down an apartment number for Little Dilly.  The district court asked again about the conversations Wilson had had with Wyatt, and Wilson reiterated that Wyatt, the night before, had said she would appear at trial that day and testify consistently with her text messages.  That morning, however, Wyatt had fallen off the grid and stopped responding to both Wilson and Deblasi's sister.  The district court asked if the government had anything to add—and it did not.

The government pivoted, however, to an idea Wilson had raised earlier: the possibility of introducing the text messages between Wyatt and Deblasi's sister under Federal Rule of Evidence 804.[1] Byron told the district court that he saw two issues with this plan: first, he doubted that Deblasi could establish unavailability because "Wyatt is not saying that she's unavailable. She's saying that she is available and intends to appear. . . . [S]he's simply not appeared." Second, Byron argued that the statements in Wyatt's texts were not supported by sufficient corroborating circumstances because, aside from those texts, she consistently denied that the drugs were hers. Wilson disagreed, contending that Wyatt was indeed unavailable and that there was "nothing to refute her statement or admission against her own interest that it's her drugs." Without making any decision on either enforcing the subpoena or admitting the text messages, the court recessed.

Trial resumed, and the government finished its case and rested. Outside the presence of the jury, the district court again inquired about Wyatt, and Wilson stated "it appears that the potential witness is unavailable and making herself unavailable. . . . She has not been reachable." Wilson also told the court that he had a

---

[1] Rule 804 provides for exceptions to the usual rule against hearsay when the declarant (in this case, Wyatt) is unavailable. In particular, Rule 804(b)(3) allows for admissibility of statements that are contrary to the unavailable declarant's proprietary or pecuniary interest, so long as the statements are "supported by corroborating circumstances that clearly indicate [their] trustworthiness." And, as a threshold, Rule 804(a) defines the criteria that render a declarant "unavailable."

22-10020                LAGOA, J., Concurring                9

witness—Deblasi's sister—who could authenticate the texts. The district court then heard the parties' positions on unavailability. Wilson pointed to Rule 804(a)(2), which says that a declarant is considered unavailable as a witness if she "refuses to testify about the subject matter despite a court order to do so," contending that "a subpoena is a court order that requires a witness to appear in court" and that he was "not aware that they have – the government has released her." In response, Byron disputed whether a subpoena is the type of order contemplated in Rule 804(a)(2) and announced, "[I]f it's an option for the government to release Ms. Wyatt, then I hereby release her." Pivoting to corroborating circumstances of trustworthiness under Rule 804(b)(3)(b), the district court confirmed with Wilson that Wilson had nothing else to offer to bolster the trustworthiness of the texts. The court then ruled that the text messages would not be admitted because the Rule requires corroborating circumstances indicating trustworthiness, which Deblasi could not provide. In the alternative, the district court continued, it was not persuaded that Deblasi had shown Wyatt's unavailability.[2]

Deblasi moved for a judgment of acquittal, which the district court denied; the defense rested; the parties gave their closing arguments; the district court instructed the jury; and the jury returned a guilty verdict after half an hour of deliberations. The

---

[2] The district court did, however, make a point to include the text messages in the record "so that the Court of Appeals can look at that."

district court subsequently sentenced Deblasi to 180 months' imprisonment.  This appeal follows.

## II.

More than sixty years ago, the Supreme Court announced that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The Court has "since held that the duty to disclose such evidence is applicable even though there has been no request by the accused . . . and that the duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999)  (first citing *United States v. Agurs,* 427 U.S. 97, 107 (1976); and then citing *United States v. Bagley,* 473 U.S. 667, 676 (1985)).  Indeed, "[t]he prosecutor has a duty not only to disclose such favorable evidence but also 'to learn of any favorable evidence known to others acting on the government's behalf.'" *Parker v. Allen*, 565 F.3d 1258, 1277 (11th Cir. 2009) (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

This concurrence should not be read to conclude that the government in fact violated *Brady* in this case.  I recount the obligations crystalized in that line of cases, however, because *Brady* is a fundamental aspect of "the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler*, 527

22-10020                LAGOA, J., Concurring                11

U.S. at 281.  Of *Brady* and the related *Giglio*[3] requirements, the Department of Justice's handbook devotes an entire section to policies regarding disclosure "so as to ensure that trials are fair."  Dep't of Justice, Justice Manual § 9-5.001 (Policy Regarding Disclosure of Exculpatory and Impeachment Information).  This is consistent with the Supreme Court's clear pronouncement that "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."  *Brady*, 373 U.S. at 87.  And, as the Court observed, "[a]n inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.'"  *Id.*  As I expressed at oral argument, however, the government's course of conduct here suggests a win-at-all-costs approach, taken at the expense of uncovering truth—as a trial is intended to do.

### III.

There can be little debate that Wyatt's text messages, if true, were exculpatory.  Her messages to Deblasi's sister include the following statements:[4]

> That day we got arrested together
>
> The dope they found, it was mine

---

[3] *Giglio v. United States*, 405 U.S. 150, 154 (1972).

[4] I replicate Wyatt's spacing and punctuation in the text messages.  Each separate line represents a new text message.

> Joey didn't know I had it
>
> I told him to open his door after the lady cop told me to pull forward
>
> And I threw it out his door hoping she wouldn't see
>
> But she did
>
> Do you understand?
>
> He didn't know anything about it at all
>
> I love y'all so much
>
> Say something please bae
>
> . . .
>
> He opened the door for me but he had just woken up . . . he didn't understand what was going on at that time
>
> . . .
>
> I'm not sure what I should do man I don't wanna go to jail but
>
> But there's no way I could live with myself if Joey had to take the punishment . . he was trying to do right and live a better life
>
> Joey keeps calling me . . does he know that I told you?
>
> If you're talking to him now please 3 way

At the end of the conversation, Deblasi's sister issued the following warning:

> If you truly mean what you say. Then David Wilson will be the only person that would be able to help you

22-10020                LAGOA, J., Concurring                13

get the information that's needed before 8 tomorrow morning.

To that, Wyatt simply responded, "Okay."

Despite this exchange—eleventh hour though it may have been—the government took every opportunity to shut down efforts to investigate Wyatt's knowledge and forged ahead with trial. On my review of the record, the government had five separate opportunities to tell the district court that the best decision was to track down Wyatt and put her under oath to examine her willingness to testify and, if she would, the substance of her testimony. And, given the choice each time, the government chose pursuit of a verdict over pursuit of truth.

*One*: When Wilson first brought Wyatt's texts to the district court's attention, the jury had not yet been sworn. The government, to be clear, seemed to have had no idea that Wyatt was changing her story until Wilson raised the issue.[5] But, at that moment, the government became aware that Wyatt was claiming the drugs as her own, necessarily exculpating Deblasi in the process. It was the government's obligation in that moment—consistent with *Brady*, Department of Justice policy, and the Oath of Attorney[6]—

---

[5] Nothing in the record indicates that anyone associated with the prosecution team had advance knowledge of Wyatt's exculpatory story, and I do not intend to suggest otherwise.

[6] Florida's Oath of Admission to The Florida Bar includes a promise not to "counsel or maintain any suit or proceedings which shall appear to [the

14                    LAGOA, J., Concurring                    22-10020

to investigate Wyatt's knowledge before proceeding with trial.  And the record confirms that the government was on notice of this obligation, as the AUSA agreed that Wyatt's texts "are highly exculpatory if true and if believed."  But the government chose not to examine that potentially exculpatory lead.

*Two*:  The next morning, when Wilson told the district court that he had made contact with Wyatt before being ghosted again, the court pointed out that Wyatt was under "the government's subpoena" and indicated that it was the government's to pursue (or not).  Again, the government chose not to do so.

*Three*: Later that day, on the topic of bringing Wyatt into custody, Wilson pointed out that the government had an address at which it had served her subpoena.  In response, the government maintained that it would "not ask[] her to be brought to court" and that it was "not asking for a warrant to be sent."  Why?  Because Byron had already decided that he did not "believe [Wyatt was] going to present truthful testimony," curtailing the fact-finding mission before it could begin.  Indeed, aside from the belief that Wyatt was lying about Deblasi's innocence, the government could not "think of anything" else that would justify not bringing Wyatt in.

*Four*: During the lunch recess, the government had nothing to add to the ongoing discussion of locating Wyatt, but instead raised its objections to Wilson's backup plan—bringing in the text

---

lawyer] to be unjust" and a pledge of "fairness, integrity, and civility" owed "to opposing parties and their counsel."

22-10020                LAGOA, J., Concurring                15

messages as an exhibit—disputing both Wyatt's unavailability and the reliability of the texts.

*Five*: A few hours later, after the government rested and the topic of unavailability was raised again, Byron finally declared, "[I]f it's an option for the government to release Ms. Wyatt, then I hereby release her."

It may well be true that Wyatt never "intended anything more than to throw a wrench into the government's case by claiming custody of drugs at the eleventh hour," as the government suggested to the district court. As things played out, though, nobody—certainly not the jury—ever had the opportunity to test that theory. As Byron conceded at oral argument, he charted this course because he determined that he "did not think [the change in Wyatt's testimony] was credible." But, as I indicated in response to that admission, the government is not the fact finder in a criminal prosecution—nor is an individual Assistant United States Attorney. It is not the government's job to decide whether exculpatory information is credible; we summon jurors for that very purpose.[7] Here, however, the government employed a strategic move to curtail the fact-finding power of Deblasi's jury. That conduct "casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the

---

[7] "[T]ryals by juries," John Adams said, "are the heart and lungs, the main spring, and the center wheel" of our system of government, "and without them, the body must die." Letter from John Adams to William Pym (Jan. 27, 1766), *in* 1 Papers of John Adams 164, 169 (Robert J. Taylor ed., 1977).

present case, his action is not 'the result of guile.'" *Brady*, 373 U.S. at 88 (quoting *Brady v. State*, 226 Md. 422, 427 (1961)).

## IV.

As Justice Sutherland so aptly described the job of the prosecuting attorney,

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935). Channeling the same sentiment, the Justice Manual explains that "public service is a public trust, meaning that the decisions and actions that federal employees take must be made in the best interests of the American people." Justice Manual § 1-4.010 (Standards of Conduct – Introduction). I cannot say, here, that the government lived up to the responsibilities and obligations with which it is entrusted.