**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 23-10123

_____

CATRELL IVORY,

*Petitioner-Appellant,*

*versus*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:21-cv-01138-PGB-LHP

_____

Before JILL PRYOR, GRANT, and MARCUS, Circuit Judges.

GRANT, Circuit Judge:

Catrell Ivory and two accomplices spent the summer of 2017 robbing Walmart stores at gunpoint. All told, the crew made out

with about $100,000.  Nothing good lasts forever, though, and police eventually arrested everyone involved.  Despite a mountain of evidence against him, Ivory maintained his innocence, declined multiple plea offers, and opted for trial.  That decision aged poorly: a jury convicted him of five robbery and gun charges, and a judge sentenced him to 319 months' imprisonment.

Ivory first appealed his convictions in 2019, and we affirmed them in a single paragraph because there were "no arguable issues of merit."  Even so, he now seeks to vacate his convictions on the ground that he received ineffective assistance of counsel at trial.  He begins with an about-face regarding his innocence.  Ivory now admits that he did, in fact, participate in some of the robberies, and he faults his attorney for encouraging him to reject the government's plea offers.  On top of that, he says that his attorney's performance was separately defective because she failed to call his cousin—one of his fellow robbers—as a witness to testify on his behalf.

We are unpersuaded.  While we make no excuses for the poor performance of Ivory's counsel, none of her errors prejudiced Ivory.  And because we cannot say that there is a substantial probability that the result of Ivory's trial would have been different without his attorney's errors, we affirm.

## I.

This appeal presents a story in three parts: the Walmart robberies, the criminal case, and the follow-on habeas proceedings. We address each in turn.

## A.

In the summer of 2017, Catrell Ivory committed two armed robberies—and attempted to commit one more—at three different Walmart stores in Florida. Each robbery followed the same pattern: three masked men clad in black and carrying guns would storm into an unlucky Walmart sometime around midnight. Once the robbers entered the store, one of them stood guard near the entrance while the other two found the store manager and forced him to "access the cash receptacle." After those two robbers grabbed the money, they would rejoin the third at the entrance, and the whole trio would flee in a stolen car. They would then ditch the vehicle, split the proceeds, and "return to their regular lives."

The first robbery occurred shortly after midnight on June 2, 2017. Inside the store, Ivory held a gun to a manager's head while one of the other robbers pressed his own gun into another manager's back. The crew wanted the store's money—and they got about $75,000 of it. As the three men left, one of them fired his gun "in the direction of" a random employee. The shot missed, and the group made its escape in a stolen Ford Edge.

Two months later, the crew struck again.  All three robbers were brandishing guns, and this time they forced shoppers to lie down on the ground as the robbery unfolded.  As for Ivory, his role was to stand near the entrance and train his gun at the hostages to keep them still.  Though the manager could not access the store's safe, the robbers still made out with about $25,000 after the manager emptied a "cash recycler machine."  Money in hand, they fled in another stolen car: this time, a Chevy Malibu.

Having twice tasted success, the men attempted to rob a third Walmart eleven days later.  The crew was once again masked, gloved, and armed.  When they entered the store, each assailant forced multiple customers to the ground at gunpoint.  But their heist was unsuccessful—the robbers could not find a manager to open the safe.  Empty-handed, they fled in a stolen Honda Civic.

When police investigated this string of robberies, they connected the stolen Ford Edge from the first robbery to a man named Bakari McCant, who is Ivory's cousin.  Less than a week after the attempted third robbery, law enforcement arrested McCant along with two other men—Jarvis Wingster and DeAndre Brewer—as they were casing yet another Walmart.  The government charged McCant with crimes related to the first and second robberies, and all three men with crimes related to the attempted fourth.  No one faced charges for the third.

After arresting those three, law enforcement turned its sights on Ivory, who has his cousin McCant to thank for that.

McCant's first call after his arrest was to his aunt—Ivory's mother. During the call, McCant said that he needed Ivory's mother to "tell that boy to stay where the fuck he at." It is undisputed that Ivory is "that boy." Ivory's mother obliged and told her son to lie low.

Wingster, one of the other two arrestees, chose to cooperate with the government and further implicated Ivory. He told investigators point-blank that he, McCant, and Ivory robbed the first two Walmart stores. And even without Wingster's confession, cell-phone location data put Ivory near the Walmarts that were targeted in the second and third robberies.

Given this evidence, a grand jury indicted Ivory on five robbery and gun charges.

**B.**

Ivory hired Nicole Blair Dickerson to represent him at trial. She has since been disbarred in Florida for general dereliction of duty. *See* Formal Complaint for Reciprocal Discipline at 4, *Florida Bar v. Dickerson*, No. SC19-616 (Fla. Apr. 16, 2019); *Florida Bar v. Dickerson*, No. SC20-1452, 2020 WL 6703176, at *1 (Fla. Nov. 16, 2020).

Ivory's case was set for trial in January 2019. Before trial, the government offered him two plea deals, but he declined them both. Ivory later explained that even though he didn't want to put his family through the stress of a trial, his "mind wouldn't let [him] admit to something [he] didn't do." Ivory insisted that he was

6                    Opinion of the Court                    23-10123

completely innocent and that he had an alibi for each of the three robberies. And he added that Wingster was a "sneaky person" who had simply "lied" when he pointed the finger at Ivory.

A week before trial, Ivory's attorney filed a writ of habeas corpus ad testificandum to transport McCant from prison in West Virginia to Florida to testify on Ivory's behalf. The court denied the motion, explaining that Ivory's attorney had "unduly delayed in requesting the writ," and that the late request provided "insufficient time" to work out the logistics of transporting McCant to Florida. Ivory's attorney responded by moving to continue the trial so that McCant could testify, claiming that McCant's testimony was "absolutely necessary" to Ivory's defense. The court denied that motion too. It explained that because McCant still needed to talk to his own attorney about the ramifications of testifying at Ivory's trial, it was unclear whether he would testify at all. The court also underscored the serious "potential Fifth Amendment impediments to Mr. McCant providing testimony."[1]

The morning of trial, Ivory's attorney filed a renewed motion to continue. Because of the government's delay in disclosing certain cell-site-data evidence, she said, Ivory's rebuttal expert would be unable to review the evidence in time to testify. The court denied this motion as well.

---

[1] The district court also chastised Ivory's attorney for "delaying in the preparation of" her case.

The trial did not go well for Ivory. Wingster testified that it was he, McCant, and Ivory who robbed the first Walmart. Wingster described how he stayed at the front of the store and made the Walmart employees lie on the ground at gunpoint, while McCant and Ivory looted the store's safe. A few minutes after the robbery began, he explained, Ivory fled with the money and McCant ran out behind him while firing his gun into the store. Wingster also walked the jury through the Walmart security footage and pointed out which one of the masked men was Ivory.

He went on to testify that he robbed the second Walmart with Ivory and McCant too. This time, he "made sure" that he was one of the people physically securing the money because he felt that he had been shortchanged last time. So Ivory served as the hostage controller: he was in charge of forcing everyone to lie down on the ground while the other two collected the cash. After explaining the role of each participant, Wingster again identified Ivory on the surveillance footage.

Also on the stand was an FBI cellular analyst, who testified that Ivory's phone connected to a cell tower near the second Walmart and explained that his phone pinged from that location no less than eight times during the robbery. And on the night that the group attempted the third robbery, the analyst added, Ivory's phone repeatedly connected to a cell tower near the targeted Walmart. Ivory at first denied that the phone was his—"hell, no," he told an FBI agent—but he admitted at trial that it was one of his "drug phones."

While the government did not present cell-site evidence tying Ivory to the first robbery, it had plenty of evidence to prove the point. On the day before that heist, Wingster called McCant fifteen times and Ivory six times. And an FBI examiner explained that this barrage of calls was of a "significantly higher volume" than in the months before. Adding to the suspicious nature of the calls, Wingster tried to place them from an "unknown" number by dialing star 67 to conceal his real number.

In the face of all this evidence, Ivory took the witness stand and maintained his absolute innocence. Specifically, he claimed that he could not have possibly committed the robberies because he had an alibi: he was with his girlfriend during the first robbery and was selling marijuana during the other two. As for his cell phone—the one that pinged the cell towers near two of the Walmart locations—Ivory explained that he shared it with McCant and Wingster. Wingster's testimony? Simply "fabricated." The jury didn't buy it and found Ivory guilty on all counts.

Next came sentencing. At his hearing, Ivory stated under oath that he declined the government's plea offers because his "mind wouldn't let [him] admit to something [he] didn't do." He urged the court to give him "another chance"—he again insisted on his complete innocence, swearing that it "was not [him] in those robberies" and claiming that Wingster had "lied" at trial. The court was unmoved and sentenced him to 319 months' imprisonment.

Ivory appealed the conviction and sentence. But his appellate counsel moved to withdraw, explaining that there were no arguable issues for appellate review. *See Anders v. California*, 386 U.S. 738 (1967). After examining the record, we granted counsel's motion to withdraw and affirmed.

## C.

A little over a year later, Ivory (with the benefit of new counsel) challenged the lawfulness of his conviction under 28 U.S.C. § 2255. Among other things, he contended that his trial attorney provided ineffective assistance of counsel. *First*, he said that she made misrepresentations that induced him to reject favorable plea offers from the government. *Second*, he maintained that his lawyer's failure to call McCant as a witness at trial was deficient performance that prejudiced him. If McCant had testified, Ivory insisted, then there would have been a reasonable probability that the jury would have acquitted him on the counts dealing with the first robbery.

As an exhibit to his motion, Ivory attached a letter from McCant. In the letter, McCant stated that Ivory's attorney never contacted him about the case. He wrote that he would have provided the following testimony had he been contacted:

- "Catrell Ivory was not involved in [the first] robbery in any manner, not in the planning or participation."

- "I had possession of [Ivory's] phone July 30–31st [the second robbery]."
- "That phone was passed around to multiple people including . . . myself, Jarvis Wingster & Catrell Ivory."
- "Both jail phone calls to my aunt"—Ivory's mother— "were only related to marijuna [sic] and a small amount of money related to marijuna [sic] sales."

The district court rejected Ivory's motion without holding an evidentiary hearing, and it denied him a certificate of appealability. Ivory sought to appeal the decision, and this Court agreed to hear him on two issues. *First*, whether the district court erred in denying—without an evidentiary hearing—Ivory's claim that his attorney improperly induced him to reject his plea offers. *Second*, whether the district court erred in determining—again without an evidentiary hearing—that Ivory was not entitled to relief based on his attorney's failure to secure McCant as a witness.

We answer each question in the negative.

## II.

We review a district court's decision to deny an evidentiary hearing for abuse of discretion. *Winthrop-Redin v. United States*, 767 F.3d 1210, 1215 (11th Cir. 2014). We will reverse only if the district court applied an "incorrect legal standard," applied the law in an "unreasonable or incorrect manner," followed "improper procedures" in making its decision, or made factual findings that are "clearly erroneous." *Id.* (quotation omitted).

**III.**

**A.**

We begin with Ivory's claim that his trial counsel was ineffective because she "improperly induced" him to reject favorable plea offers. Specifically, Ivory maintains that his Sixth Amendment right to counsel was violated because his attorney told him that she had secured two witnesses to testify on his behalf when, in fact, she had done no such thing. He insists that this conduct was constitutionally deficient because if his attorney had not misled him about these witnesses, then he would have pleaded guilty and received a shorter sentence. The district court rejected that argument without holding an evidentiary hearing. It was within its discretion to do so.

Federal prisoners may challenge the legality of their convictions and sentences under 28 U.S.C. § 2255, the "new and more efficient statutory substitute for habeas corpus." Nancy J. King & Joseph L. Hoffmann, *Habeas for the Twenty-First Century* 10 (2011). If there has been a "denial or infringement of the constitutional rights of the prisoner," then we "vacate and set the judgment aside." 28 U.S.C. § 2255(b). A prisoner seeking such relief is entitled to an evidentiary hearing if he "alleges facts that, if true, would entitle him to relief." *Winthrop-Redin*, 767 F.3d at 1216 (quotation omitted); *see also* 28 U.S.C. § 2255(b). He "need only *allege*—not prove—reasonably specific, non-conclusory facts that, if true, would entitle him to relief." *Winthrop-Redin*, 767 F.3d

at 1216 (quotation omitted).  But no hearing is required for allegations that are "patently frivolous, based upon unsupported generalizations, or affirmatively contradicted by the record."  *Id.* (quotations omitted).

To show that he is entitled to an evidentiary hearing on his ineffective-assistance-of-counsel claim, Ivory's § 2255 motion must allege facts that would show (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Griffith v. United States*, 871 F.3d 1321, 1329 (11th Cir. 2017).  Ivory must carry his burden on both prongs, and we "need not address both prongs if the defendant has made an insufficient showing on one."  *Osley v. United States*, 751 F.3d 1214, 1222 (11th Cir. 2014).

The "proper measure of attorney performance" is "simply reasonableness under prevailing professional norms."  *Strickland*, 466 U.S. at 688.  "To establish deficient performance, a petitioner must show that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Griffith*, 871 F.3d at 1329 (quotation omitted).  In other words, the bar for showing deficiency is high.

The same is true for showing prejudice.  To do that, Ivory must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "A reasonable probability," in turn, is a probability "sufficient to

undermine confidence in the outcome." *Id.* What's more, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

When it comes to challenges involving plea agreements, "a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012). And in a situation like the one we have here—where the allegedly ineffective advice "led not to an offer's acceptance but to its rejection"—a defendant must show that three things would have happened "but for the ineffective advice of counsel." *Id.* at 163–64. *First*, that there is a reasonable probability that "the defendant would have accepted the plea and the prosecution would not have withdrawn it." *Id.* at 164. *Second*, that "the court would have accepted its terms." *Id.* And *third*, that under the rejected plea offer "the conviction or sentence, or both . . . would have been less severe" than what the defendant received after trial. *Id.*

We do not take the government to dispute that Ivory's counsel was deficient. It would be hard-pressed to do so—the Florida Bar explicitly referenced counsel's conduct in this very case as it began the process of disbarring her. *See* Formal Complaint for Reciprocal Discipline at 3, *Florida Bar v. Dickerson*, No. SC19-616 (Fla. Apr. 16, 2019). So we need not belabor the point: it was not "reasonable" for Ivory's attorney to tell him that she had secured two witnesses to testify on his behalf when she had not so much as contacted either one. *Strickland*, 466 U.S. at 688.

Still, that is only the first part of the analysis. When it comes to prejudice, Ivory's argument falters. The reason is simple: he cannot show that he "would have accepted the plea" without his deficient counsel. *Lafler*, 566 U.S. at 164. In fact, Ivory's insistence that he would have taken the plea is "affirmatively contradicted by the record." *Winthrop-Redin*, 767 F.3d at 1216 (quotation omitted). Ivory repeatedly maintained that he was innocent of all charges and insisted that he had nothing to do with the robberies. What's more, this actual-innocence defense was not a spur-of-the-moment trial decision—Ivory filed a pretrial motion swearing that he had an alibi on the night of each robbery.

Ivory continued to maintain his innocence even after he was convicted on all counts, pleading with the sentencing judge that he was "not a robber" and that it "was not [him] in those robberies." He explained that he rejected the government's plea offers because his "mind wouldn't let [him] admit to something [he] didn't do." And he accused Wingster of lying, insisting that a person in jail "will say anything to get [himself] home as soon as possible." An interesting assertion under the circumstances.

In short: Ivory "persistently refused to accept responsibility and adamantly professed his innocence during all stages of his criminal proceedings." *Rosin v. United States*, 786 F.3d 873, 878 (11th Cir. 2015). His choices at trial "reflected an infinite resolve to proclaim his innocence; they did not manifest any intention" to "accept responsibility for the conduct alleged." *Id.* at 879. And even during his sentencing hearing, when Ivory was "afforded the

opportunity to make a statement to the court and to, perhaps, accept personal responsibility for the conduct alleged," he declined to do so. *Id.*

Given all that, we have little difficulty concluding that "the record evidence patently contradicts" Ivory's assertion that, but for his trial counsel's error, "he would have accepted a guilty plea and not insisted on going to trial." *Id.* Without any evidence apart from his own "conclusory after-the-fact assertion"—discounted by the copious "record evidence contradicting" that assertion—the district court did not abuse its discretion in declining to hold an evidentiary hearing. *Id.*; *see also Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991) ("after the fact testimony" insufficient to establish prejudice).

**B.**

Ivory also argues that his attorney's failure to call McCant as a witness rendered his defense constitutionally defective. But this argument fails in the same way as the last: Ivory cannot show prejudice. That's true for two reasons: it is highly unlikely that McCant would have testified, and even if he had, the end result would have been the same.

When a defendant raises an ineffective assistance claim based on counsel's failure to call a witness, the defendant carries a "heavy" burden to show prejudice. *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006). That's because "often allegations of

what a witness would have testified to are largely speculative." *Id.* (quotation omitted).  And here the risk of pure speculation is even greater because it was "highly unlikely" that McCant would have testified in the first place. *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981).  After all, he was "charged with participating in the same robber[ies]" as Ivory, and his own appeal was still pending during Ivory's trial. *Id.*  Simply put: there is little in the record showing that McCant "was willing to testify and waive his Fifth Amendment privilege against self-incrimination."

Indeed, McCant faced several "significant tactical issues" when it came to testifying at Ivory's trial.  For one, if McCant had testified on Ivory's behalf, that would have jeopardized his own pending appeal.  For another, McCant (who was charged with crimes related to all but the third robbery) might have unwittingly "implicate[d] himself in an as-yet uncharged robbery" during his cross-examination.  And for another still, McCant would have exposed himself to a future perjury charge if he had lied on the stand.  Given these risks, we cannot imagine that any competent attorney would have advised McCant to testify, rather than try to talk him out of it—as Ivory's counsel herself acknowledged at oral argument.

But even if McCant *had* testified, we think that testimony would have done his cousin more harm than good.  Recall that Ivory's entire defense was that he was positively innocent of all charges.  McCant's testimony would not have bolstered that defense—it would have taken a sledgehammer to it.  McCant's

23-10123                Opinion of the Court                17

now-revealed testimony is that Ivory was not involved in the first robbery; he does not deny Ivory's participation in the second and third robberies.  His silence on those two is telling.  What would a jury have made of the inconsistency between Ivory's protestations of absolute innocence and his cousin's testimony tying Ivory to the second and third robberies?    Though it would be "largely speculative" to guess—that's one problem with Ivory's argument—we don't see how it would have helped him.  *Sullivan*, 459 F.3d at 1109 (quotation omitted).

And even putting those concerns aside, the "absence of exculpatory witness testimony" is more likely to prejudice a defendant when there is "little record evidence of guilt." *Fortenberry v. Haley*, 297 F.3d 1213, 1228 (11th Cir. 2002).  But here we have the opposite—substantial record evidence of Ivory's guilt.

*First*, recall that Wingster testified point-blank that Ivory participated in the first and second robberies, and even identified Ivory as he walked the jury through the Walmart surveillance footage.  Cell-site data corroborated this testimony for the second robbery, and it put Ivory near the third robbery as well. *Second* was the flurry of unusual phone calls between Wingster, McCant, and Ivory leading up to the first robbery—calls that seemed especially suspicious because Wingster tried to hide his number when he placed them.  *Third*, McCant's first call when he got to jail was to Ivory's mother, who he told to make sure that Ivory would "stay where the fuck he at."  Ivory's mother dutifully relayed the message.

Given all that, the chance that McCant's testimony would have led to a different result at Ivory's trial was a far cry from "substantial." *Harrington*, 562 U.S. at 112.  The district court thus did not abuse its discretion in declining to conduct an evidentiary hearing for his § 2255 claim.  In the end, the "files and records of the case conclusively show that the prisoner is entitled to no relief."[2]  28 U.S.C. § 2255(b).

⋆    ⋆    ⋆

No doubt, Ivory received poor counsel at his trial.  But in a case with this much evidence, that is not what made the difference.  We **AFFIRM**.

---

[2] The certificate of appealability also included the question of whether the district court erred by "declining to consider McCant's letter" when it denied Ivory's claim that "counsel failed to present testimony from McCant at trial." But on our review of the record, the district court *did* consider the letter—albeit in a footnote—so there was no error.